LORENZO CADWELL, Appellant, *v.* DANIEL MEEK *et al.,* Appellees.

### APPEAL FROM FULTON.

An agent is a competent witness to establish his relation to his principal, and a contract made for him, unless the agent has a direct interest in the result of the suit.

If an agent is equally liable to either of the parties, he is a competent witness, and his supposed preferences will affect his credibility only.

To bind the principal by the acts of his agent, he must be fully and fairly informed of all the material facts and circumstances of the transaction.

The usual course of dealing by a party, cannot vary or control a contract.

THIS suit was commenced in the Fulton Circuit Court, by attachment, to recover $1,758.23, the price of sixty-two head of beef cattle. Declaration in assumpsit, containing the common counts. On the return of the attachment, the defendant below, (appellant in this court) appeared and plead the general issue.

The cause was tried at the May term, 1855, Hon. O. C. SKINNER, presiding, by a jury; verdict was found for the amount claimed by the plaintiffs below, (appellees in this court.) Motion made for a new trial, and overruled, and judgment rendered on the verdict. The defendant below brings the cause here by appeal.

On the trial in the Circuit Court, the plaintiffs claimed: that one Ezra Cadwallader was the agent of the defendant; that they sold to him, as such agent, the beef cattle, for the price of which they sued; that the price was agreed on by the plaintiffs and the agent; that the money was to be paid on the delivery of the cattle to the defendant; and that the cattle had been weighed, delivered to, and accepted by, the defendant, he knowing that Cadwallader had acted as his agent in the purchase.

The defendant admitted that he had received the cattle, and that they were worth the amount claimed by the plaintiffs, and that Cadwallader purchased the cattle, yet he denied that Cadwallader *was his agent*, or had any authority to contract for him with the plaintiffs, so as to make him liable to them, or that he received the cattle, knowing that Cadwallader had assumed to act as his agent; but on the contrary, the defendant claimed that Cadwallader purchased cattle of whom he pleased, on his

own terms, and at his own risk, and re-sold them to the defend-
ant at an agreed price; or in other words, that Cadwallader
was liable to the plaintiffs, while he, Cadwell, was liable to
Cadwallader. The defendant further claimed, that he had an
offset against Cadwallader for an amount more than sufficient to
pay the price of the cattle, and hence, that he was not indebted
for them to any one at the time suit was brought.

The defendant further claimed, that there was a *custom under
which Cadwallader had acted for him*, and under which he, the
defendant, *received the cattle*, and insisted that all his statements
and acts were *explained by, and consistent* with, that custom.
This custom was, that large dealers in the products and trade of
the country had dealings mainly with certain persons, called
*runners* or *buyers*, who were not agents, but who examined and
bought from the farmers and country merchants the articles
wanted, on their own terms, and at their own risks, and then
furnished them to the larger dealers, under a contract entered
into before, to receive a certain amount at some agreed price;
and that it was also a part of this custom, that the large dealers
should furnish money to the *runner*, in advance, wholly or partly,
on delivery of the property, or otherwise, from time to time,
depending on the understanding of the parties, in order to ena-
ble him to secure the best bargains; but that there was no bind-
ing obligation to furnish the money in advance. The legal
effect of the transaction between the wholesale dealer and his
retail buyer, being that the property was to be paid for on de-
livery, and that the wholesale dealer never became liable to the
various persons about the country, from whom the *runner* might
choose to purchase.

On trial of the cause in the Circuit Court, Moses F. Hand
was sworn, as a witness for the plaintiffs, who testified that he
resided in Warren county; that Ezra Cadwallader lived in Ellis-
ville, Fulton county, on the way from Liverpool, in the same
county, to the residence of the witness; that the defendant had
been engaged for the three preceding seasons (years), in pack-
ing beef at Liverpool, on the Illinois river; that the witness had
furnished the defendant with beef cattle during that time, which
the witness raised and bought for that purpose; that he had not
acted as defendant's agent, but that he first made a contract
with the defendant to furnish the cattle on certain terms, and
deliver them at the packing house in Liverpool; then he bought
them of whom he could, on the best terms he could, running all
risks till delivered, taking any profits over the price he paid for
himself, and was entitled to the agreed price from the defendant;
that the defendant let him have money, as suited the conve-

nience of both parties, and was not responsible to the persons of whom the witness bought.

The witness also stated, the defendant had repeatedly told him, that whatsover Underhill Boynton said, with reference to buying cattle, was right, and that Boynton had *acted* as the *agent* of the defendant in *buying* cattle for the defendant, during the time he had done busines at Liverpool; but that the defendant had never informed him that Boynton had authority to *appoint other agents* for the defendant, and that he had no knowledge of his ever doing so; that he knew no *other agent* of the defendant than Boynton.

The witness testified to a contract made by himself with the defendant, through Boynton, in the fall of 1854, and its contents, during which it was disclosed, that the contract was in writing.

*Anson Smith* was sworn for the plaintiffs, and testified that Underhill Boynton, a short time prior to buying of the cattle in controversy, called at his office in Ellisville, to see *Ezra Cadwallader*, who was absent at Chicago; that Boynton left word with the witness, to deliver to Cadwallader, on his return, as follows: to tell him that they wanted some beef in a hurry, and for him to buy; that he would give them a certain price, (not recollected by the witness,) per 100 lbs. for cattle delivered at Liverpool; or if he did not want to buy on those terms, to buy anyhow; that he, (Cadwallader) could make one or two hundred dollars as easy as not; that they would pay him for his services, but nothing said as to how, or what price, and nothing said as to pay by the day; that the witness could also tell Cadwallader, that he could have money from time to time, as he needed it, or he would send him some immediately.

The witness further stated that he delivered the message to Cadwallader on his return; that Cadwallader said he would not buy by the hundred—would not lay himself liable—but would spend a few days in getting some cattle.

The witness also stated, on cross-examination, that he never informed either Boynton or defendant of Cadwallader's answer, and he did not know whether they knew how he acted in the purchases made.

*Ezra Cadwallader* was called as a witness by the plaintiffs and sworn on his *voir dire*. The plaintiffs admitted that the witness was called for the purpose of proving that he was an agent of the defendant, and as such, purchased the cattle from the plaintiffs, for the price of which this suit was brought. The witness stated that he had no more interest than any person would have, who acted as an agent; that he received the message from Boynton, left with Anson Smith; that he had no other

authority from the defendant; that he bought the cattle as an agent, and informed the plaintiffs so at the time. He further stated that there was no agreement between himself and the plaintiffs that he would pay them for the cattle, if they failed to recover in this suit, *but that the witness expected to pay them,* as they should not lose by him.

Objection was made to the introduction of the witness, but the court overruled the objection, to which the defendant excepted.

The witness was then sworn in chief, and testified to the receipt of the message through Anson Smith from Boynton, substantially as stated by Smith; that he acted on the authority given by that message, and bought as the agent of the defendant, expecting to charge by the day for his services; that he did not see Boynton or defendant till after all the cattle he bought were delivered, and when he did see the defendant nothing was said as to Boynton's agency.

Objection was made to the introduction of the statements of the witness to plaintiffs, as to his authority, and overruled, to which there was exception taken.

The witness then stated that he told the plaintiff, that he wanted to buy for the defendant, as agent; that he bought sixty-two head of cattle, to be weighed at Ellisville, and that they amounted to $1,858.23; that he sent them to Liverpool by one Sackett, with an order for the money ; that he had received, at a previous time, $250, of which he paid $100 to the plaintiffs, but received none when he sent plaintiffs' cattle.

On cross-examination, the witness stated, that Smith told him, that the defendant proposed to give $5 per 100 lbs. net, the weight to be ascertained at Liverpool, where the cattle were to be slaughtered ; that nothing was said to him as to *buying by the gross, on a credit,* or as to ascertaining the weight *elsewhere than at Liverpool* in the manner stated. He further stated, that he *never informed either Boynton or the defendant that he would not buy* and furnish beef by the 100 lbs. as proposed.

The witness further stated, that he bought three lots of cattle for the defendant that season, of which the plaintiffs were the last, all of which he sent to Liverpool by Sackett. With each lot he sent some written statement, signed by Cadwallader & Smith (they being partners), of the cattle, with a verbal or written order for money ; that the order was not to pay the money to the plaintiffs, but to send it to the witness. When the plaintiffs' cattle were sent, no money was returned, but a message was sent by Sackett from the defendant to the witness, that he had been disappointed in getting money by express, for the witness to come down to Liverpool the next Saturday, and stay

over Sunday; that he had a settlement to make with him, and he should have the money to take back; that the witness did go down as requested, and when there presented an account of $25 for five days' services in buying cattle, to which the defendant replied, "rather short"; that the next time he bought cattle he would have them weighed at Liverpool; at the same time he gave a bill of the cattle from his private memorandum book, and the account might have been made out as between Cadwallader & Smith, with the defendant; that at the same time the defendant and witness looked over a "corn transaction" between the defendant and Cadwallader & Smith of two years before. The defendant made out an account current, and gave to the witness to examine, and claimed over $4,000, due to the defendant, which the witness stated was too much, as he did not owe as much as $3,000. The witness also stated, that the defendant did not ask him to offset the price of the cattle he had bought, against the amount due for corn directly, but "intimated it pretty strong," stating that he was in a tight place, and needed the money, to which the witness replied that he had bought the cattle with the promise of the money, and he would not use the money of the sellers to pay his debts, to which defendant made no reply. The witness also stated, that the cattle referred to in this conversation, was all of the three lots, on which he had received $250.

The witness then stated further, that he had furnished cattle to the defendant for two prior seasons, but not as agent; that he bought, sometimes having the money advanced, and then furnished to the defendant at an agreed price, and so far as he knew, all others, dealing with the defendant, had done the same thing; that as a country merchant, it was convenient and profitable for him in selling goods, and collecting debts, to take cattle and sell them to the defendant.

S. D. Sackett was then sworn for the plaintiffs, who testified that he drove the three lots of cattle to Liverpool, for Cadwallader, with the instruction to deliver to Boynton; that the witness met the defendant at one time, when he drove down the cattle got of John Danley, and inquired of him at *whose expense* an *extra hand was to be kept;* to which the defendant replied, "at mine—I foot all the bills—Cadwallader is at work for me." At another time he asked the defendant if he was to have the plaintiffs' cattle, to which he replied "that he had written to Cadwallader to buy them for him if they were nice." In a few days after, the witness drove down the plaintiffs' cattle. The defendant was in a fret, and refused to receive them, and it was arranged that they should be put in a field over night at the risk of the witness, and in the morning the defendant received them.

The witness stated that he took a written statement of the weight, signed, Cadwallader & Smith. The witness also requested defendant to send some money, to which he replied that he had none to send—to tell Cadwallader to come down the next Saturday and spend Sunday with him—that he had a settlement to make with him, and he should have the money to take back.

The witness testified, on cross-examination, that the only bills or expense spoken of by the defendant, was the expense of the extra hand, for driving, and that he did not say how or on what terms Cadwallader was at work for him.

The plaintiffs thereupon rested.

Henry Walker was then called, as a witness for the defendant, and testified that he had been engaged in Fulton county, in the cattle business; that he had, for three years past, bought cattle of the farmers, and re-sold to the defendant; that many others had also been dealing with the defendant; that the defendant had, for three years, been engaged at Liverpool, a town on the Illinois river, in Fulton county, in buying pork and beef and in packing the same, and that the business at that place, in the defendant's line, was done entirely by himself and those connected with him.

Thereupon, the defendant offered to prove what the *general custom of dealers* was during that time, in the place where the defendant transacted his business, with regard to the *manner of buying and procuring beef cattle*, and also what the *general custom* was in the *county and country at large* in *the same business;* also what the *universal custom* of the *defendant* was in *the business*, together with the fact that the witness was well acquainted with such customs. To this the plaintiffs objected, and the court sustained the objection, to which the defendant excepted.

It was also proposed to show the same facts by several other witnesses, but the court refused to allow the evidence to go to the jury, to which exception was taken.

The defendant then called Underhill Boynton as a witness, who testified that he was, and had been for some time, an agent of the defendant, authorized to select beef cattle; that the defendant himself was not a competent judge of the quality and price, but left that matter to the witness, who was skillful in that line; that the witness *had no authority whatever to appoint other persons agents for the defendant*, and that the only agent defendant had last season, was the witness; he also stated that he did *not give* any *authority* to Ezra Cadwallader to *buy* for the defendant, but that, in passing through Ellisville, he left word with Anson Smith to tell Cadwallader he wanted 1,000 head of cattle, and for him to buy on the same terms as he had

the years before ; that he was very anxious to have him buy, as they were in a hurry to make up the lot; that on the next day, as he returned from Moses T. Hand's, (with whom he had made a contract, meanwhile,) he stopped and told Smith to tell Cadwallader that he could buy, if he wished, on the same figures that Hand had agreed to buy, and if he was short of money, that they would send him some up, or he should have it when he wanted it.

The witness also stated that the cattle for which this suit was brought, were bought by the defendant of Cadwallader & Smith, through the word he left with Anson Smith, and that they were not *authorized to act in any other* way than that in which *Hand did*—to buy of whom they pleased, and the defendant was to take them at an *agreed price* per 100 lbs., and to *pay the expense of driving*.

The witness also stated that he was present, and heard the conversation between Cadwallader and defendant, at Liverpool, mentioned by Cadwallader in his testimony. The defendant made the sum due from Cadwallader & Smith on the " corn transaction," $4,300. Cadwallader said it footed up more than he expected, and it would ruin him to turn the *whole* of the cattle on the amount due defendant; to this the defendant replied that it was tight times, but if his money came, as he expected, he would let him have money, as he had done before.

·This witness further states that Cadwallader did not dispute the amount due defendant, or claim that he had bought plaintiffs' cattle as an agent, but was willing to turn a part of the money on the corn matter.

The witness stated, further, that when the plaintiffs' cattle were sent down, a bill was sent, directed to the witness, signed Cadwallader & Smith, giving the weight of the cattle, but not stating of whom they were procured.

1st. The Circuit Court erred in permitting improper evidence to go before the jury.

2nd. The Circuit Court erred in admitting Ezra Cadwallader as a witness.

3rd. The Circuit Court erred in refusing to admit the evidence offered by the defendant, &c.

4th. The Circuit Court erred in refusing to grant a new trial.

Goudy and Judd, for Plaintiff in Error.

W. Kellogg, for Defendants in Error.

Scates, C. J. Ezra Cadwallader was a competent witness to prove his own agency for plaintiff, and the contract he made for

him with defendants. This is the general and uniform rule, and well supported by authority. 1 Stark. Ev. 133 ; *Lowber* v. *Shaw*, 5 Mason R. 242 ; *McGunnagle* v. *Thornton*, 10 Serg. and Raw. R. 252 ; *Harvey and Claxton* v. *Sweasy*, 4 Humph. R. 450 ; *Christy* v. *Smith*, 23 Verm't R. 670.

This general rule is subject to qualification. An exception to it will exclude agents, as other witnesses, for an immediate and direct interest in the result of the suit. 1 Stark. Ev. 103 to 120, where the various interests are presented ; and 23 Verm't R. 670 ; 4 Humph. R. 450 ; *Shiras* v. *Morris et al.*, 8 Cow. R. 60. *Sage* v. *Sherman, &c.*, 25 Wend. R. 430, and *Emerton* v. *Andrews*, 4 Mass. R. 653, are further examples of that primary liability which renders a witness or an agent incompetent.

But this exception to the general rule is also subject to a modification ; for, where a witness is equally liable to the one or the other party who may be condemned by the judgment, his supposed bias from interest is removed ; he stands indifferent, and becomes, under such circumstances, competent, and existing preferences, if any are apparent, will go to his credit. *Birt et al., Assignees of Glover,* v. *Kershaw*, 2 East. R. 458 ; *Ilderston* v. *Atkinson*, 7 Term R. 480, and note of *Evans* v. *Williams et al.* An honorary obligation will only go to the credit. *Frink* v. *McClung*, 4 Gil. R. 576.

The testimony of the agent was submitted to the jury, with full and proper instructions upon the whole case, including the agent's credit, and explanatory and rebutting proofs. We can not disturb the verdict, under such circumstances, believing, as we do, that the evidence fully sustains the verdict, whether viewed in the light of a previous authority or a subsequent ratification of the acts of the agent. We recognize, and fully sanction, the rule applicable to ratifications of the acts of agents, that, to make them binding, the principal must be fully and fairly informed of all the material facts and circumstances. *Owings* v. *Hull*, 9 Pet. R. 628 ; *Hastings* v. *Bangor House Proprietors*, 18 Maine R. 436 ; *Sage* v. *Sherman*, &c., 25 Wend. R. 430.

There is no suppression of a material fact shown in this record.

If Cadwallader is to be believed—and we have no reason to doubt, supported as he is by other witnesses and circumstances—notwithstanding Boynton did not hear nor swear to all that the other says transpired—plaintiff was fully advised of the fact that Cadwallader had purchased the cattle as agent; that the money was due and belonged to defendants, and not to him ; and he was not willing, and had no right, to take their money to pay his own debts. Boynton would be understood as conveying a different impression of what transpired between the plain-

tiff and witness; but I think he is fully corroborated by the witness who drove down the cattle, who gives plaintiff's own statements, that Cadwallader was at work for him, and that he had written to him to buy defendants' cattle if they were nice. He must, therefore, be responsible for his own reception and retention of these cattle, with a full knowledge that they did not belong to Cadwallader, and which he knew, for any thing in the record, in due time to have refused them, if not content to purchase of defendants.

The answer he would make to this state of facts, is his own usual course of dealing in that neighborhood for three years, as a legal custom of trade.

No such usage or custom, although it may be a general one, can be allowed to alter, vary or control the express terms of a contract. *Dixon* v. *Dunham*, 14 Ill. R. 324. It may explain what is not agreed expressly, and how an implied contract may be understood and fulfilled. We do not think this particular individual usage, even if admissible, would explain or contradict the facts in this record. Such may have been plaintiff's usual course of dealing, while supplies of beef cattle could be procured through *runners*, as intermediate purchasers; and yet, when one who had so acted refused to engage any further in that mode of trade, but assumed to act and purchase as an agent, and plaintiff receives cattle so purchased with a knowledge of that fact, he shall not be permitted to set up his previous course of dealing, by which he seeks, and would succeed, if allowed, in taking defendants' cattle to pay the debts of a former customer, who now assumes his own agency, as the means of procuring possession of their cattle. This custom might have greater weight had it greater age and an universality. I know that particular individual customs of companies and houses have been received to fix the rights and liabilities of customers and the powers of agents. Such was the case of *Jones* v. *Warner*, 11 Conn. R. 40, which allowed the regular course of the trade of the house, to show that its clerk had no authority, to make a contract out of that regular usage.

So in *Loring et al.* v. *Gurney*, 5 Pick. R. 15, a like individual usage was allowed on its being proven that the customer was aware of it.

*Thompson* v. *Hamilton et al.*, 12 Pick. R. 425, and *Halsey* v. *Brown et al.*, 3 Day R. 346, are instances of a general custom in particular localities, which were allowed to explain rights and liabilities arising on implied contracts, as that masters of coasters sailed the vessels on shares with the owners, as a mode of fixing the owners' compensation for the use of the vessel;

and again, that freights for gold, silver, &c., were a perquisite of the master; and did not belong to the charter or owner of the vessel.

In *Reuner* v. *The Bank of Columbia,* 9 Wheat. R. 581, (5 Cond. R. 691,) a constant and uniform usage of the banks of Washington city, and Alexandria, in the District, to allow four, instead of three days of grace, on bills and notes was recognized and upheld. The court in sustaining this usage, advert to the fact that it had been the uniform usage from the establishment of the bank in 1793, and it was well known and understood by the defendant, when he indorsed the note upon which he was sued.

Upon a like principle, a general usage or course of trade in particular articles of commerce have been sustained under like circumstances. Thus in *Sewall* v. *Gibbs et al.,* 1 Hall R. 602, on sale of indigo in ceroons, it was usual to deduct ten per cent. for tare,—but in cases of fraudulent packing, the actual tare; and so a deduction of seventeen per cent. was allowed upon proof of the custom and fraudulent packing. But in no case have I found a special, local or individual custom received to contradict a contract. There is no dispute but that these cattle were expressly and avowedly bought for plaintiff, and by one professing to act as agent only. To allow the plaintiff to set up his individual usage or course of dealing through one agent alone, would be to allow him to take advantage of defendants.

Had plaintiff refused to receive the cattle under Cadwallader's purchase for him as agent, and this suit had been brought on that contract to enforce it against him, he might and would occupy a different ground; and upon showing that he had pursued such a uniform course of trade through one agent only, and alone with intermediate purchasers, and defendant's knowledge of such course of dealing, might present grounds for rebutting an agency and raising a suspicion of fraud or want of good faith and fairness on their part, in contracting so far out of that usage. Such a supposed state of facts might implicate the defendants for bad faith. But in the absence of such facts, such usage as is offered would apparently enable plaintiff to perpetrate a fraud upon defendants.

*Judgment affirmed.*