Loren Hufford, doing business under name and style of Brownsburg Canning Co., Appellee, v. National Retailer-Owned Grocers, Inc., a corporation, and Central Retailer-Owned Grocers, Inc., Defendants, Central Retailer-Owned Grocers, Inc., Appellant.

Gen. No. 47,154.

First District, First Division.

December 16, 1957.

Released for publication February 10, 1958.

1

2

Litsinger, Gatenbey & Spuller, of Chicago (Andrew W. Gatenbey, Lawrence Spuller and Fred H. Law, Jr., of counsel) for appellant.

King, Robin, Gale & Pillinger, of Chicago (Willard L. King, and George W. Gale, of counsel) for plaintiff-appellee.

PRESIDING JUSTICE SCHWARTZ delivered the opinion of the court.

This is an appeal from a judgment on verdict against Central Retailer-Owned Grocers, Inc. (Central) for $6,379.35 for breach of a contract of sale. National Retailer-Owned Grocers, Inc. (National) was the original defendant. The suit was later dismissed as to National, and Central became the sole defendant.

Plaintiff is engaged in the canning business in Brownsburg, Indiana, under the name of Brownsburg Canning Co. At the time of the purchase and sale Central was known as Central Division, National Retailer-Owned Grocers, Inc. It is located in Chicago and is a purchaser of canned goods for retail grocers. One Charles G. Briner, a food broker in Indianapolis, Indiana, negotiated the sale of tomatoes by plaintiff to a purchaser which both Briner and the plaintiff assumed to be National. The precise relationship of National to "Central Division, National Retailer-Owned Grocers, Inc.," or to "Central Retailer-Owned Grocers, Inc.," as it was later called, is not made clear except that such a relationship exists and that Central was permitted to use the name of National.

On September 3, 1952, an order for 7,500 cases of tomatoes was given to plaintiff by defendant through Briner. As the construction of the terms of that order is the vital part of this case, we reproduce the order as follows:

4

"Central Division
PURCHASE ORDER

NATIONAL RETAILER-OWNED
GROCERS, INC.,
308 West Washington Street
Chicago 6, Illinois.

ORDER NO. 6956

Put number on your invoice
when billing.

DATE September 3, 1952
TERMS 1½%—10 days ·
F.O.B. Indiana

To
Brownsburg Canning Company
Brownsburg, Indiana.

~~Attached~~

Shipping Instructions: Will follow.

| Quantity | Item | Price |
|---|---|---|
| 7,500 cs | 24/2 Extra Standard Tomatoes<br>Less ¼% Swell Allowance<br>Less Usual Label Allowance | 1.77½ |

Central Division,
NATIONAL RETAILER-OWNED
GROCERS, Inc.,
By: J. M. King (Signed)

Please mark all shipments plainly
with name and quantity of contents.
Seller guarantees merchandise shipped
against this order to conform to
all Federal and State Regulations.
Render invoice promptly after ship-
ment is made."

5

The words "Central Division" are in small print and that, together with their location, seem almost deliberately designed to deceive a seller with respect to the identity of the purchaser. The use of such a deceptive document by Central is nowhere explained.

After the receipt of this order plaintiff received by express 60,000 labels of National which he affixed to cans and he then awaited shipping instructions which the broker promised would be promptly forthcoming. On November 10, 1952, the broker wrote the purchaser that the cans had been labeled and requested shipping instructions. Central made no answer to the letter. In January 1953 plaintiff came to Chicago and saw John M. King, whose signature was attached to the order. Plaintiff told King he wanted to ship the tomatoes as soon as he could, that he needed the money, and that the price of canned tomatoes had fallen. In response, King said he would have a shipment go to Grand Rapids in the next 10 days and that plaintiff had "nothing to worry about." On May 4, 1953, Central issued shipping instructions for 1,000 cases and again, on June 22nd for 600 cases "To apply on our purchase order No. 6956." The price of tomatoes continued to decline, and not receiving any shipping instructions, plaintiff sold the tomatoes he had on hand for the best price he could get.

The complaint as originally filed alleged National to be the purchaser of the goods. An answer was filed by National denying that it was the purchaser and denying all the material averments of the complaint, but it offered no explanation of the fact that the name "National Retailer-Owned Grocers, Inc.," was clearly on the order as purchaser. A motion to strike the answer was sustained on the ground that it was simply a general denial and therefore was in violation of the Civil Practice rules. The answer was stricken and a new answer was filed which in substance again denied that National entered into the contract, denied

6

that it agreed to give shipping instructions or had dealings with the plaintiff or that it was indebted to plaintiff. This answer was also stricken on motion of plaintiff. A third amended defense was filed and by that time it appeared, not from the answer but from other information, that the real contracting party was Central Retailer-Owned Grocers, Inc. Thereupon Central Retailer-Owned Grocers, Inc. was made a party defendant and the suit proceeded. We have cited these proceedings in detail because despite the care with which the Practice Act has been drawn to require a fair and explicit statement of defense, in the instant case there appears from the very outset to have been a deliberate concealment of Central as the one who did business with plaintiff. Even at the ancient common law one who filed a plea of this character was compelled to give the plaintiff a better writ, that is, to state who the right party was, if he knew. Where a party defendant, obviously identified with the transaction involved in the litigation, stubbornly adheres to this method of defense by general denial, a court could and should, after the first amended defense is stricken, enter judgment against the defendant.

 The principal defense rests on the contention by Central that no binding contract was entered into and that the order in question was only a tentative estimate of the purchaser's approximate need. An examination of the purchase order reveals nothing tentative in its terms. It is a definite and precise order, subject only to shipping instructions. Central offered to prove usage of the trade to establish that such an order is only a memorandum of possible needs of the buyer during the packing year. The trial court excluded this testimony. Evidence of usage is not admissible to create a contract where none existed (Currie v. Syndicate Des Cultivators, 104 Ill. App. 165 (1902)) nor, conversely, to destroy a contract where one has been created. Usage or custom is ad-

missible to explain or make clear what a contract means but not to contradict a meaning obvious on the face of the instrument. Cadwell v. Meek, 17 Ill. 220; Bissell v. Ryan, 23 Ill. 517; Gilbert & Co. v. McGinnis, 114 Ill. 28; Western Union Cold Storage Co. v. Winona Produce Co., 197 Ill. 457; Turner v. Osgood Art Color-type Co., 223 Ill. 629; Ambarann Corp. v. Old Ben Coal Corp., 395 Ill. 154; Traff v. Fabro, 337 Ill. App. 83; Garofalo Co. v. St. Mary's Packing Co., 339 Ill. App. 412.

Central relies on El Reno Grocery Co. v. Stocking, 293 Ill. 494 (1920). In that case a broker undertook to sell a certain amount of canned corn on behalf of a canner. His authority was expressed in a letter which stated that the seller made a price of 75 cents for the corn and that the broker might sell 15,000 cases. Nothing was said as to time of payment or delivery. The broker prepared two memoranda with respect to the sale. Both were addressed to the seller, one saying that the broker had confirmed the sale of 2,000 cases, and the other saying "We have sold subject to confirmation." Evidence was offered to show that it was the custom of the trade to exchange notes of this character with respect to contracts for future delivery, but to follow them up with the execution of a formal, written contract. Under these circumstances the court permitted the introduction of evidence as to usage, saying, however, that the general rule is ". . . while usage may be admissible to explain what is doubtful, it is never admissible to contradict what is plain" citing 12 Cyc. 1091. The distinction between that case and the instant case is that the order given to plaintiff embodies all the necessary terms of a contract and is not made subject to confirmation or any other contingency.

If usage or custom were permitted in a case of this character, it still would be necessary to show that the plaintiff also understood such usage or cus-

8

tom. Corrigan v. Herrin, 44 Ill. App. 363; Packer v. Pentecost, 50 Ill. App. 228; Bank of Commerce v. Miller, 105 Ill. App. 224. The trial court was correct in ruling against the admission of evidence as to usage.

■ Complaint is made by Central with respect to the ruling of the court as to plaintiff's Exhibit No. 3 attached to a deposition taken on behalf of plaintiff. This exhibit was a sales memorandum issued by the broker containing a notation: "Sold to: National Retailer Owned Grocers, Inc. . . ." and on the margin were the words "if incorrect, advise immediately," and "Subject to confirmation of Seller." This deposition was taken when National was the sole party to the case. It was read in evidence before National was dismissed. After National was dismissed, the judge advised the jury that because the testimony contained in the deposition would be binding only upon National and not on Central, they should disregard it and should also disregard the sales memorandum attached to deposition. This was a proper ruling, but Central now seeks to take advantage of that portion of the exhibit which it considers has some probative value on the question of whether the contract was subject to confirmation. It argues that the party intended to be named was Central Retailer-Owned Grocers, Inc., and that therefore the court should not have withdrawn the exhibit. Having created the confusion, Central now seeks to profit by it. There is no merit in this point. Moreover, as we herein point out, there can be no doubt that both parties time and again reaffirmed the contract as a binding obligation.

■ Central argues that the court erred in refusing to give its instruction based on Chapter 121½, Section 44(1), Illinois Revised Statutes 1955, to the effect that where a seller delivers to a buyer a quantity of goods less than he contracted to sell, the buyer may reject them, but if the buyer accepts or retains the goods knowing that the seller is not going to per-

9

form the contract in full, he must pay for them at the contract rate. It bases this upon a letter dated November 10, 1952, from Briner, the broker, indicating that plaintiff had only 6,009 cases of tomatoes on hand instead of 7,500. Plaintiff testified that he could always have supplied 7,500 cases of the kind of tomatoes ordered, and the condition of a declining market would support his position in that respect. In January 1953 Central orally confirmed the purchase and in May and June of that year it gave shipping instructions for portions of the goods ordered, thus confirming the order as a subsisting contract. There was, according to defendant's buyer, no price stated on the shipping instructions when they were sent by Central. After the instructions left Central's office the price was put on in ink. The broker transmitted the shipping instructions to plaintiff and instructed him to invoice the tomatoes at the lower price. The plaintiff objected, but the price of tomatoes had declined and in May 1953 plaintiff had started selling them to buyers other than Central. When he followed shipping instructions from Central and obtained the best price he could, he was doing no more than mitigating his damages. The instruction complained of was not appropriate to the facts in this case.

Plaintiff had prepared a memorandum showing the items of damage as he estimated them and he used this memorandum to refresh his memory on the stand. Counsel for Central took the memorandum, had it marked Defendant's Exhibit 1, and introduced it in evidence. This exhibit went to the jury room, and it is clear that the jury followed it literally as the basis for computation of damages, excluding only two items, referred to later, which plaintiff's counsel told them to exclude. In this memorandum plaintiff computed his direct loss by reason of the breach of contract at $3,908.39. To that amount he added $960 for removing labels and cleaning. Central argues that this item

was improper because plaintiff himself testified that under the contract, he was not to affix labels. However, the labels were sent to plaintiff for the purpose of having them affixed to cans before they were shipped out. The labels were put on the cans in anticipation of shipping instructions and when the instructions were not forthcoming and the goods were sold elsewhere, the labels had to be removed. We therefore consider this a proper item of damages. However, Central is correct in its contention that the amount allowed is not supported by the evidence. Plaintiff testified that approximately 60,000 labels had been affixed to cans and that the cost of removal was 60 cents a case (each case consisting of 24 cans). 1,600 cases were shipped pursuant to shipping instructions from Central and therefore it was not necessary to remove the labels on those cans. Those 1,600 cases would have used 38,400 of the 60,000 labels, leaving 21,600. At plaintiff's own figure of 60 cents per case, his expense would have amounted to $540, instead of $960, and that is the sole amount which should be allowed for this item of damages.

The next two items, warehouse charges and interest thereon, as shown on plaintiff's computation of his damages in the exhibit referred to, were excluded by the jury at the express direction of plaintiff's counsel and need not here be considered.

The next item which is challenged is the allowance of interest at six per cent for three years, or $1,114.96. Central contends that no interest is allowable on a contract which is partly written and partly unwritten. The purchase order contained all the material terms of the contract and although it was not signed by the seller, it constitutes a contract in writing within the meaning of the statute relating to interest. Murray v. Doud & Co., 167 Ill. 368. The precise time at which the purchaser was obligated to pay for the goods purchased cannot be determined with exactness

11

nor was any specific demand made, and in such case interest should be computed from the time of the filing of the amended statement of claim and the making of Central a party to the case, to-wit: February 9, 1955. Under our statutes interest is allowable at five per cent, not six per cent, and should be computed on that basis from February 9, 1955, as Central contends.

■■■ Two other items were included in the memorandum and in the jury's verdict, to-wit: "Boxes—2000 extra—$200," and "Interest on $200—$36." Plaintiff concedes that these are not supported by any testimony and that the items were included in the verdict only because they were in the memorandum known as Defendant's Exhibit 1. However, plaintiff argues that Central led the jury into making whatever errors occurred in its computation of damages because Central introduced this memorandum in evidence. Central, having introduced the exhibit in evidence, cannot complain that it was error to let the exhibit go to the jury, and it does not charge that this was error. What it now argues is that the items we have before described, while included in the computation, are not proper items of damage. This it may properly do.

Judgment in this case should therefore be for the sum of $3,908.39 plus $540, or $4,448.39. To this should be added interest at the rate of five per cent from February 9, 1955, to the date of the entry of the judgment herein, December 16, 1957 or a total of $5,083.91.

The judgment of the trial court is reversed and judgment entered here for the amount of $5,083.91.

McCORMICK and ROBSON, JJ., concur.