*Decision will be entered under Rule 50.*

ESTATE OF BERTHA M. REDFORD, DECEASED, THE FIRST NATIONAL BANK OF CHICAGO, EXECUTOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5962–67.   Filed December 1, 1970.

*Vernon T. Squires* and *William R. Dickinson, Jr.,* for the petitioner.
*James F. Hanley, Jr.,* for the respondent.

IRWIN, *Judge:* Respondent determined a deficiency of $4,183.32 in the estate tax of petitioner's decedent. Certain questions having been resolved by the parties, the sole issue presented is whether, under section 2033 or section 2037,[1] the value of amounts remaining in a pension plan account on the date of death of petitioner's decedent was properly included in her gross estate. Should we resolve this question in the negative, petitioner will be entitled to a refund for overpayment of estate taxes.

FINDINGS OF FACT

Many of the facts have been stipulated by the parties. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

The First National Bank of Chicago, the petitioner herein, is executor for the Estate of Bertha M. Redford, deceased. Bertha M. Redford (hereinafter Bertha) died testate on June 29, 1963, leaving as her only heirs at law a daughter, Berneice E. Rice, and a son, Lester L. Becker. On September 25, 1964, petitioner filed a Federal estate tax return for the Estate of Bertha M. Redford, deceased (hereinafter the estate) with the district director of internal revenue, Chicago, Ill. Included in the estate tax return was an interest described as the "Walgreen Profit Sharing Retirement Trust" (hereinafter the Redford account). The date of death value of the Redford account is now

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended.

agreed by the parties to have been $73,438.68. Whether or not this account should have been included in Bertha's estate for Federal estate tax purposes is, as stated above, the sole question before us. Should we determine that the account was improperly included in the estate tax return, petitioner will be entitled to a refund of estate taxes paid.

Percy J. Redford (hereinafter Percy), Bertha's second husband, had, during his lifetime, worked for the Walgreen Co. On June 7, 1958, Percy died intestate. He was survived by Bertha, and by a brother and sister, both of whom resided in Canada. Neither of Bertha's children had ever been adopted by him.

While with the Walgreen Co., Percy was a participant in what was then known as the Charles R. Walgreen Memorial Pension Trust Plan (hereinafter the pension plan). Pertinent provisions of this plan are as follows:

AGREEMENT

\*          \*          \*          \*          \*          \*          \*

WHEREAS, the Company desires that a pension trust be established and maintained to provide income to its eligible employees after their retirement, from funds paid to the Trust in part by the Company and in part by such employees, upon the terms and conditions hereinafter set forth;

\*          \*          \*          \*          \*          \*          \*

ARTICLE II

Participating Employees

\*          \*          \*          \*          \*          \* ,          \*

Section 3. Form of Acceptance. Acceptance of the Trust by an eligible employee shall be evidenced by such employee signing and delivering to the Trustees an acceptance in substantially the following form:

TO THE TRUSTEES OF THE
CHARLES R. WALGREEN
MEMORIAL PENSION TRUST:

Having been born on the _____ day of _____ _____, and my eligibility to become a participating employee under the provisions of the Charles R. Walgreen Memorial Pension Trust having been determined, *I hereby voluntarily accept the terms and conditions set forth in the agreement dated December 17, 1940, creating such Trust (a copy of which I have received and read) and any amendment to such agreement at any time adopted pursuant to its provisions, and on behalf of myself and my heirs, executors, administrators and assigns I agree to be bound by such agreement and any such amendment* and to perform all of the agreements therein contained by me to be performed, including the agreement to make payments to you as therein provided.

\*          \*          \*          \*          \*          \*          \*

I hereby designate _____ . _____ _____ _____, now residing at _____ _____ , _____ , as the bene-

ficiary to whom payments shall be made by you as provided in said agreement in the event of my death, hereby reserving the right to change such beneficiary in the manner provided in said agreement.

\* \* \* \* \* \* \*

Section 5.\* Beneficiaries. Each participating employee shall have the right, as provided in the form of acceptance set forth in Section 3 of this Article II, to designate one or more beneficiaries to receive all payments payable after his death pursuant to the provisions of Article VII hereof by naming such beneficiary in such form of acceptance. In the event more than one beneficiary shall be named appropriate changes may, subject to the approval of the Trustees, be made in such form of acceptance. *Each participating employee who shall have so designated one or more beneficiaries shall have the right at any time to change and successively change such beneficiary* or beneficiaries by signing and delivering to the Trustees a written instrument in such form as the Trustees shall prescribe for the purpose. *The construction of the Trustees with respect to any designation made hereunder shall be conclusive and binding upon all parties,* and no person claiming to be a beneficiary or other person shall have the right to question any action of the Trustees which, in the judgment of the Trustees, fulfills the intent of the participating employee who made such designation. \* \* \*

\* \* \* \* \* \* \*

ARTICLE VII

Payments to Employees

\* \* \* \* \* \* \*

Section 2.\* Amount and Time of Payments. Upon a participating employee (1) either (i) reaching the basic retirement age while still an employee of the Company and thereafter ceasing to be an employee of the Company, or (ii) ceasing to be an employee of the Company prior to reaching the basic retirement age because of permanent disability or death (hereinafter called 'Event 1', \* \* \*

"(a) If Event 1 shall first occur the accumulated credit shall be applied by paying the participating employee each month, throughout the period beginning on the first day of the month following the occurrence of Event 1 or on such later date as the Trustees, with the consent of the participating employee, shall select for the commencement of such payments, which day in no event shall be later than the first day of the month following the day when such participating employee shall reach age 70, and continuing until the accumulated credit is exhausted an amount which the Trustees shall determine and consider reasonable for pension purposes; provided, however, that such monthly payment shall not be (i) less than a minimum of $25.00 or 25% of such participating employee's average monthly compensation during the 36 months immediately preceding the occurrence of Event 1, whichever amount is the greater, or (ii) more than 50% of such average monthly compensation. The above-mentioned minimum may be reduced by the Trustees, with the consent of the participating employee, to a lesser amount. If in the judgment of the Trustees such maximum amount would constitute an unreasonable amount for pension purposes it may be reduced to such amount, not less than the above-mentioned minimum, as the Trustees shall consider reasonable. The Trustees may, in their sole discretion, at any time after the occurrence of Event 1 and before the participating employee reached age 70, use all or any part of the accumulated credit then re-

maining unpaid to provide a life annuity of a type appropriate for such participating employee. * * * *The trustees, upon the written request of the participating employee, may, in their sole discretion, at any time after the occurrence of Event 1 and within the taxable year of the participating employee in which Event 1 occurs, pay the entire amount of the accumulated credit to the participating employee for the purpose of enabling him to purchase a life annuity or fixed payment annuity contract,* satisfactory in form and terms to the participating employee and to the Trustees.

\* \* \* \* \* \* \*

Section 6.* Effect of Death. *If the occurrence of Event 1 is due to death of the participating employee, or if he dies after the occurrence of such event and before receiving payment of the full amount to which he shall be entitled, his designated beneficiary, or, if there be no such beneficiary, his personal representative or any other person legally entitled to receive payments from the Trustees shall succeed to all of the rights and privileges which the participating employee would have had* if the occurrence of such event had not been due to his death or if he had survived the occurrence of such event, as the case may be, provided, however, that in cases where there is no beneficiary, payment of such balance may, in the discretion of the Trustees, be made in a lump sum to such personal representative or other person legally entitled thereto.

\* \* \* \* \* \* \*

### Article XI

### Miscellaneous

\* \* \* \* \* \* \*

Section 2. Amendment. *This agreement may be amended at any time* and from time to time by an instrument in writing executed by the Company and all of the then acting Trustees hereunder and such amendment shall become effective after 30 days' written notice thereof shall have been given to all participating employees, unless within said 30 days more than ⅓ in number of all participating employees shall object thereto in writing, * * *

\* \* \* \* \* \* \*

Section 7.* Non-assignability. In no event shall the Trustees pay any money or assign any property payable, distributable or standing to the credit of any participating employee to any assignee or creditor of such employee; and no participating employee shall have the right by way of anticipation or otherwise to assign or dispose of any moneys or other property which may be payable, distributable or stand to his credit under the Trust, and every attempted assignment or other disposition of such moneys or property, or any part thereof, shall be absolutely void.

[Emphasis supplied. Footnotes omitted.]

Pursuant to the power vested in him, under the pension plan, to designate beneficiaries, on March 31, 1958, Percy named Bertha as his beneficiary. The designation was addressed to the trustees of the Charles R. Walgreen Memorial Pension Trust, and directed that:

Under the provisions of the Charles R. Walgreen Memorial Pension Trust, and under the provisions of Continental Assurance Company policy No. G 574, I hereby revoke any and all previous designations inconsistent herewith and

designate as beneficiary under both said Pension Trust and said Insurance Policy: [Bertha was named.]

\* \* \* \* \* \* \*

The right to change the beneficiary hereby designated is reserved.

This designation was not changed during his lifetime. Accordingly, after his death, the trustees of the pension plan directed all payments from the Redford account to Bertha.

On November 21, 1959, using a form provided by the Walgreen Co., Bertha filed with the trustees of the pension plan a document which purported to designate her two children as successor beneficiaries under the pension plan. The terms of this document were as follows:

Under the provisions of the Charles R. Walgreen Memorial Pension Trust, I hereby revoke any and all previous designations inconsistent herewith and designate as beneficiaries under said Pension Trust:

| Name | Address | Relationship | Age | Proportionate share (percent) |
|------|---------|--------------|-----|-------------------------------|
| I. Mrs. Berneice Rice_____ | Route 5 Allegan, Mich. | Daughter_____ | 47 | 50 |
| II. Lester L. Becker_____ | Readlyn, Iowa____ | Son_____ | 48 | 50 |

In making the above designations, it is my intent that if any one of the above named beneficiaries predeceases me, or dies after my death before receiving all payments, the share, or the unpaid portion which he or she would have received if living shall be distributed equally to the living lawful descendant or descendants of such deceased beneficiary, but if there are none or said lawful descendant or descendants are not then living, then such share shall go to the other named beneficiary, or if said other named beneficiary be deceased, equally to his or her living lawful descendants.

The above form was received by a Miss Thomas—one of the Walgreen clerks assigned to the pension plan. Receipt of the document was acknowledged by an appropriate notation on its face, and it was thereafter committed to file. As was the case with almost all such instruments, no notification of its receipt was communicated to the trustees of the pension plan—it then being Walgreen's practice to allow such matters to rest until circumstances dictated the need for an investigation with respect to an impending distribution. Accordingly, at no time did Bertha receive word from the company with respect to the effectiveness or propriety of her purported designation. The instrument naming her children as successor beneficiaries was not, during her lifetime, amended. At the time of the within proceeding, payments from the Redford account were being made to her two children.[2]

---

[2] Sec. 7, par. 7.8[2], of the Walgreen Profit Sharing Retirement Plan (adopted in 1961 and reproduced at length at a later point in this opinion) would have directed that the funds in the Redford account, absent a valid designation by Bertha, be

On October 1, 1961, the Walgreen Co. adopted a new retirement plan (which was in effect at the time of Bertha's death) entitled the "Walgreen Profit-Sharing Retirement Trust" (hereinafter the profit-sharing plan). Pertinent provisions of the new plan which was viewed by the trustees as a continuation of the pension plan, but which restated and superseded the provisions of the older plan, were as follows:

### WALGREEN PROFIT-SHARING RETIREMENT TRUST

\* \* \* \* \* \* \*

WHEREAS, by instrument dated December 17, 1940, as amended by further instruments dated as of September 30, 1944, January 30, 1951, October 1, 1956 and October 1, 1957, said Walgreen Co. established the "Charles R. Walgreen Memorial Pension Trust"; and

WHEREAS, said Walgreen Co., said subsidiaries and *said Trustees desire to restate and supersede said Charles R. Walgreen Memorial Pension Trust by this Instrument,* entitled "Walgreen Profit-Sharing Retirement Trust," and hereinafter called the "Agreement," and by a separate instrument made a part hereof and incorporated herein by reference, entitled "Walgreen Profit-Sharing Retirement Plan," and hereinafter called the "Plan";

Now, THEREFORE, in consideration of the mutual undertakings of the parties hereto, it is HEREBY AGREED as follows:

### Article I—Effective Date of Agreement

This Agreement and the Plan, made a part hereof and incorporated herein by reference, restate and supersede, effective as of October 1, 1961, the "Charles R. Walgreen Memorial Pension Trust." [Emphasis supplied.]

### WALGREEN PROFIT-SHARING RETIREMENT PLAN

### Section 1—Introduction

1.1 This instrument constitutes the Walgreen Profit-Sharing Retirement Plan, referred to herein as the "Plan" and is incorporated by reference into the Wal-

---

distributed to Bertha's children in precisely the manner described above. Consequently it is not clear whether the distributions to Bertha's children were being made pursuant to her designation, as opposed to sec. 7 of the profit-sharing plan, the activation of which would have required a preliminary finding by the trustees that her designation was invalid.

By contract, it is clear Bertha's executor (the petitioner herein) did initially believe in the propriety of the designation, and treated it as a validly exercised power of appointment. As a result, the subject matter of the Redford account was included in Bertha's estate under sec. 2041. However, this position was taken by the executor without having first reviewed the terms of the Mar. 31, 1958, designation filed by Percy. As soon as this document was brought to the executor's attention, it immediately changed its position, determining that Bertha had never been vested with the authority to make such a designation.

Because, *inter alia,* that portion of the Redford account originally included in Bertha's estate tax return was less than the fair market value of the account on date of death, respondent asserted the deficiency contained herein. However, as a result of having changed its position with respect to that portion of the account on which tax had already been paid, petitioner-executor asserted a claim for refund (see sec. 6402(a)) in conjunction with the petition which it filed in opposition to the respondent's deficiency determination.

green Profit-Sharing Retirement Trust referred to herein as the "Agreement," dated the 2nd day of February, 1962.

\*     \*     \*     \*     \*     \*     \*

1.3 The effective date of the Plan is October 1, 1961. The term "Plan Year" is the twelve consecutive calendar months ending with each September 30, subsequent to the effective date.

\*     \*     \*     \*     \*     \*     \*

## Section 7—Distribution of Account Balances

7.1 Upon an active participant attaining his normal retirement date at age 65, or upon the termination of his employment after attaining his 60th birthday, or in the event of his retirement because of total and permanent disability, or in the event of his death, the balance in his account at his account determination date shall be the balance therein, after all adjustments thereto have been made in accordance with Section 6 hereof.

\*     \*     \*     \*     \*     \*     \*

7.3 *It is intended that distribution of the balance in a participant's account or accounts shall be made in monthly installments either to the participant or to his beneficiary.* The amount of each monthly installment shall be as determined by the Trustees and normally shall be within the following limits:

(a) Minimum—The greater of $25 or 25% of the participants average monthly compensation during the 36 months immediately preceding the date his employment was terminated; and

(b) Maximum—50% of such average monthly compensation.

\*     \*     \*     \*     \*     \*     \*

7.4 If the event establishing the account determination date is the participant's normal retirement, disability retirement or death, distribution of his account shall normally be made by monthly installments beginning with the month next following the month in which such event occurs. If the participant continues in the regular employ of the Company, monthly installments shall normally begin with the month following the month in which his regular employment is terminated.

\*     \*     \*     \*     \*     \*     \*

7.8[1] Each participant from time to time may name any person or persons as beneficiaries or successor beneficiaries to whom payments from his account balance are to be made in the case of his death before he receives all of such balance.

A beneficiary of a participant may name a successor beneficiary hereunder *provided he has such power under the designation naming him a beneficiary.*

Each beneficiary designation shall be in a form prescribed by the Trustees and shall be effective only when filed in writing with the Trustees by the participant or beneficiary during his lifetime. Each such designation shall revoke all prior designations.

\*     \*     \*     \*     \*     \*     \*

[2] If at any time a balance remains in the account of a deceased participant and there are no persons then entitled to receive payments from his account balance, either under a beneficiary designation properly made or as a surviving spouse entitled to payments from the participant's account balance in accordance with the provisions of the immediately preceding paragraph, the Trustees in

their discretion may distribute the deceased participant's account balance to either:

(a) *Any one or more or all of the next of kin* (including the surviving spouse of such next of kin), in such proportions as the Trustees determine, *of the last to die of the persons otherwise entitled* in accordance with this provision *to receive payments from such account balance;* or

(b) The legal representative or representatives of the estate of the last to die of the persons otherwise entitled in accordance with this provision to receive payments from the participant's account balance.

(Numerals [1] and [2] inserted for clarification.)

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### Section 8—Miscellaneous

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

8.4 No participant may borrow from the Trust Fund. The interests of participants and their beneficiaries under the Plan are not in any way subject to their debts or other obligations and may not be voluntarily or involuntarily sold, transferred or assigned.

[Emphasis supplied.]

Notwithstanding the preambulatory language of the profit-sharing plan in which it is treated as having superseded the older pension plan, it was the opinion of the trustees that since the new plan was merely a restatement of the old, the distribution of accounts under the new plan was intended to and did comport with the method of distribution employed under the old plan. In any event, it was their belief that the provisions of the new plan governed all distributions taking place after 1962 irrespective of the participant-employee's date of death.

### OPINION

In the instant case we are primarily called upon to interpret the language of a company retirement plan, viz, the Walgreen Company Pension Plan. The interpretation we choose will determine whether petitioner's decedent (heretofore referred to as Bertha) possessed, at the time of her death, a property interest includable in her estate for Federal tax purposes.[3]

We begin our inquiry by focusing on article VII, section 6, of the pension plan contract. By its terms, this provision clearly states that any account not fully dissipated at the time of a participating employee's death, no successor beneficiary having been named, will be paid out to the personal representative of the employee, or to any other person legally entitled to receive payments. The controversy in this case has arisen because it is argued that article VII, section 6,

---

[3] SEC. 2033. PROPERTY IN WHICH THE DECEDENT HAD AN INTEREST.

The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death.

fails to consider what is to happen in the event of the later death of a person (in this case, Bertha) who *was* designated as a successor beneficiary by an instrument which failed to arm such beneficiary with a power to appointment over funds still unused at the time of his or her death.[4] With respect to this position, petitioner contends, in the alternative, that if the alleged vacuum left by article VII, section 6, is to be filled, it is necessary to look to (a) the explicit provisions of section 7, paragraph 7.8[2], of the profit-sharing plan, or (b) the practices which were normally followed by the trustees of the pension plan under circumstances such as those present in this case.

With respect to part (a) of petitioner's argument, it has been stated in our Findings of Fact that the trustees (upon whose opinion petitioner relies) were of the belief that, under facts such as those present in this case, any distributions taking place after 1962 were to be governed by section 7, paragraph 7.8[2], of the profit-sharing plan. However, no evidence was introduced by petitioner to show that such was within the contemplation of the parties when the earlier pension plan agreement was entered into by Percy and the Walgreen Co. Nor, in light of the fact that the profit-sharing plan completely *superseded* the pension plan, can it be said that article II, section 3, of the pension plan bound Percy and his heirs to such a result since that section, by its terms, is limited to pension plan amendments, and does not consider the possibility of later documents superseding the pension plan in its entirety. Accordingly, since petitioner has not directed us to any rule of Illinois law calling for a contrary conclusion, it is our opinion that section 7, paragraph 7.8[2], cannot be given the effect which petitioner would have us attribute to it.

As we interpret petitioner's alternate argument, it is asserted that since the practices adopted by the trustees of the pension plan were pursued with uniformity and consistency, they must be accorded the status of custom and usage, and must, therefore, be treated as binding on all persons deriving their interest through the original contracting party—the participating employee. Accordingly, since it was the practice of the trustees to distribute unused amounts to the heirs of the last taker under the plan, the upshot of petitioner's argument is that the amounts which ultimately were distributed to Bertha's heirs passed to them by operation of the pension plan, and that since, during

---

[4] Respondent has asserted that Percy's designation of Mar. 31, 1958, was sufficient to provide Bertha with a power of appointment. However, it is our impression that this document did no more than name Bertha as primary beneficiary. Nowhere in the designation is there any reference to a power of appointment. Nor, in light of the fact that Percy reserved the right to rescind his designation, does it appear that he viewed the instrument as a plan of complete disposition in which Bertha would have the final say.

her life, Bertha had neither the possession of nor the power of disposition over such amounts, they cannot be regarded as having been a part of her estate at the time of her death. (Compare sec. 7, para. 7.8 [2], of the profit-sharing plan.)

By contrast to the above, respondent argues that any portion of the Redford account which did not pass to Bertha by virtue of Percy's designation must be regarded as having been retained by Percy and must be treated as having passed to Percy's estate on the occasion of his death. Respondent then argues that, since Percy died intestate, Bertha, being the sole heir of his personal estate under Illinois law,[5] must be treated as having received Percy's retained interest in the Redford account by way of intestacy. Were this so, Bertha's designation of November 21, 1959, would be effective, and the persons named in that instrument would have to be regarded as having received their interest directly from Bertha. Our decision is to favor this approach.

Though the testimony in favor of petitioner's position is scant, it was shown that a practice had developed whereby, under circumstances like those present in this case, amounts left in a pension plan account on the death of the last-named beneficiary would be distributed to the heirs of that person. However, little effort by petitioner was addressed to the question of whether this practice would, under Illinois law, be accorded the status of custom and usage to the extent that it would be considered binding on Percy and his estate, the entity through whom, respondent claims, Bertha acquired her interest. All we are told is that the distributional procedures adopted by the trustees were later formally incorporated into the profit-sharing plan, a document which specifically superseded the pension plan. No mention is made of the reason why the procedures followed by the trustees were not added to the pension plan by way of the amendment process described in article II, section 3, of the pension plan. Nor is there any suggestion that these procedures were made known to any of the 7,000 or 8,000 Walgreen employees who participated in the pension plan. Under these circumstances, our study of Illinois law leads us to the conclusion that an Illinois court would find it very difficult to accord these unwritten distributional procedures the effect sought by petitioner.

Under Illinois law, "custom or usage" is admissible to explain or

---

[5] Ill. Ann. Stat. ch. 3, sec. 11 (Smith-Hurd 1961):

Rules of Descent and Distribution

The intestate real and personal estate of a resident decedent * * * after all just claims against his estate are fully paid, descends and shall be distributed as follows:

*    *    *    *    *    *    *

Third, when there is no descendant but a surviving spouse and also a parent, brother, sister * * * of the decedent: the entire personal estate * * * to the surviving spouse * * *

make clear what a contract means but not to contradict a meaning obvious on the face of the instrument. *Hufford* v. *National Retail-Owned Grocers*, 16 Ill. App. 2d 1, 147 N.E. 2d 437, 440 (1957), and cases cited therein. This is in accord with the commonly expressed principle that a contract will be construed so as to give effect to the intention of the parties. *Katz* v. *Brooks*, 65 Ill. App. 2d 155, 212 N.E. 2d 508, 510 (1965). Where, therefore, it appears that commercial or trade practices have been conducted with such a degree of regularity and uniformity that they have taken on the mantle of custom or usage, it may be "presumed that parties [to an agreement] had [such practices] in mind * * * and that they entered into the contract intending that such custom or usage was a part thereof." *Wilke Metal Prod.* v. *David Architectural Metals*, 92 Ill. App. 2d 265, 236 N.E. 2d 303, 307 (1968).

From the above, it is clear that custom or usage may provide contracting parties, such as Percy and the Walgreen Co., with rights and obligations not specifically alluded to by the terms of their agreement. However, since the role played by custom and usage derives its efficacy from the understanding and implied acquiescence of the parties, a party to an agreement cannot be bound by custom or usage unless he either knew or should have been aware of its existence and nature. *Hufford* v. *National Retail-Owned Grocers, supra; Katz* v. *Brooks, supra;* and, generally, 5 Williston, Contracts, sec. 661 (3d. 1961). Moreover, where there is no proof of actual knowledge, implied knowledge will be imputed only where the practices in question are so notorious that the contracting parties would normally be cognizant of them. *Traff* v. *Fabro*, 337 Ill. App. 83, 84 N.E. 2d 874, 877 (1949) ; *Katz* v. *Brooks, supra; Kelly* v. *Carroll, et al.*, 223 Ill. App. 309 (1921) ; Restatement, Contracts, sec. 247, comment *b*.[6] Put another way, "A usage or custom to be binding must be so uniform, long-established, and generally acquiesced in, and so well-known, as to induce the belief that the parties contracted with reference to it." *Traff* v. *Fabro, supra.*

Additionally, since the incidence of custom and usage is a question of fact, *Gourley* v. *Chicago & E. I. Ry. Co.*, 295 Ill. App. 160, 14 N.E. 2d 842, 848 (1938), its presence must be proven like any other fact. In this regard, the burden of proof rests with the party asserting its presence. *Armour Grain Co.* v. *U.S. Grain Corp.*, 241 Ill. App. 332 (1926) ; Restatement, Contracts, sec. 247(c). In the present case we

---

[6] *b.* A party cannot be bound by usage unless he either knows or has reason to know of its existence and nature. Accordingly one who seeks either to define language or to annex a term to a contract by means of usage must show either that the other party is actually aware of the usage, or that the existence of the usage in the business to which the transaction relates is so notorious that a person of ordinary prudence in the exercise of reasonable care would be aware of it. If so notorious, actual knowledge of it is immaterial.

are persuaded that petitioner has failed to meet that burden. Not only are we uninformed as to whether the practices in question were ever made known to Percy, but we are also uninformed as to whether any of the Walgreen employees who participated in the pension plan were ever apprised of the unwritten distributional methods employed by the trustees. Under such circumstances, it can hardly be said that these practices were so well known as to induce the belief that Percy contracted with reference to them. Accordingly, petitioner's argument with respect to these practices must fail.

With the above in mind, we now return to article VII, section 6, of the pension plan—the provision on which respondent has grounded his case. As we have stated, this provision clearly indicates that, if a successor beneficiary has not been designated, amounts not consumed on the date of death of a participating employee will be paid to the personal representative of his estate. However, under petitioner's interpretation, a problem arises where the person to die is a taker who has succeeded the participating employee. Given such circumstances, petitioner argues that the language of article VII, section 6, cannot be read to provide for a reversion of amounts yet unused to the personal representative of the original employee's estate. We disagree.

Looking at article VII, section 6, we note the following directive:

if * * * the participating employee * * * dies * * * before receiving payment of the full amount * * *, his designated beneficiary, or, if there be no such beneficiary, his personal representative * * * shall succeed to all of the rights and privileges which the participating employee would have had * * *

In our view the language quoted above was designed to focus on one problem, viz, the possibility that amounts contained in a given account would be unused on the death of a participating employee. In the event of such an occurrence, the above provision permits the continued distribution to a beneficiary where one has been designated. However, where a person has not been so designated, article VII, section 6, in our opinion, contemplates a distribution of *all* such amounts to the employee's estate so that such funds will be disposed of in accordance with the testamentary wishes of the employee. Only by this method of distribution could it be certain that amounts still owing to an employee on his death would find their way into the hands of the natural objects of his bounty, be they persons named in a will or persons taking in the event of intestacy. If our interpretation thus far is correct—and we do not read petitioner's brief as being in dispute with such interpretation—then it would appear equally appropriate to conclude that where, as a result of an incomplete designation, *less than all* of the amounts left in a pension account on the death of an employee might not be consumed, then the ultimate distribution of

any such unused amounts should also be made through the employee's estate.

In this case, Percy's designation of March 31, 1958, was incomplete in that it failed to envisage the possibility of Bertha's death prior to the exhaustion of the Redford account. Accordingly, it is our conclusion that under the terms of article VII, section 6, of the pension plan, any amounts left in the Redford account at the time of Bertha's passing were to be distributed to Percy's estate, there to be disposed of according to the laws of intestacy of the State of Illinois. This being so, Bertha, being Percy's sole heir in the event of intestacy, must be deemed to have possessed, at her death, a vested interest in such amounts includable in her estate under section 2033 of the Code.

*Decision will be entered for the respondent.*