Wilke Metal Products, Inc., a Corporation, Plaintiff-Appellant, v. David Architectural Metals, Inc., a Corporation, Defendant-Appellee.

Gen. No. 50,840.

First District, Fourth Division.

January 22, 1968.

Rappaport, Clorfene & Rappaport, of Chicago (Hamilton Clorfene, of counsel), for appellant.

Schwartz, Cooper, Kolb & Cohen, of Chicago (Malcolm M. Gaynor and Lloyd S. Kupferberg, of counsel), for appellee.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

This is an appeal from the entry of an order by the Circuit Court of Cook County, First Municipal District, on June 11, 1965, finding for the plaintiff upon the issues joined on plaintiff's complaint, and assessing the plaintiff's damages at the sum of $8,404.80; further finding for the defendant on the issues joined on the defendant's counterclaim, and assessing defendant's damages at the sum of $12,989.88; and judgment order against plaintiff and in favor of defendant in the sum of $4,585.08 and costs.

On September 12, 1961, the plaintiff, Wilke Metal Products, Inc. (hereafter referred to as Wilke), filed its complaint to recover an unpaid balance of $8,404.80 for windows sold and delivered to the defendant, David Architectural Metals (hereafter referred to as David). The complaint further alleged that there was due in-

terest at 5 percent per annum caused by the vexatious delay of the defendant in making payment to plaintiff.

On October 19, 1961, David filed its defense and counterclaim, setting out as defense that Wilke had failed to fabricate and furnish said windows in accordance with the plans, specifications and architectural drawings agreed upon. David's counterclaim alleged that subsequent to the installation of said windows it was determined that the windows were improperly fabricated and were not in accordance with plans, specifications and architectural drawings; that David made demand upon Wilke to correct the defect, but Wilke refused to do so, and David was required to furnish labor and materials in order to make the corrections in the windows; and that David expended the sum of $13,649.20 for such labor and materials.

On February 1, 1962, Wilke filed its reply to the defense and counterclaim, denying the allegations of defendant's defense and defendant's counterclaim. The reply further stated that any expenditures by David were not caused by any alleged defects in fabrication by Wilke. The case was tried by the court without a jury, and on September 26, 1963, the court entered judgment in favor of David and against Wilke in the sum of $4,585.08. From that judgment this appeal is taken.

On February 13, 1964, Wilke filed its notice of motion for leave to file its amended reply to the defense and counterclaim to conform the pleading to the proof, which motion was denied by the court on the following day.

On August 20, 1959, Wilke and David entered into an agreement whereby Wilke agreed to manufacture 4,464 aluminum window frames and screens and to sell them to David for a total price of $85,000. On April 8, 1960, a supplementary agreement was signed by the parties modifying the agreement of August 20, 1959, providing that "Wilke agrees to furnish the Windows required for the University Apartments, 55th Street and Dorchester Ave-

nue, Chicago, Illinois, in strict accordance with Architectural Drawing 'WINDOW-SKETCH' dated March 25, 1960 and revised March 26, 1960, except that the horizontal leg of the head and jamb sections may be set back $\frac{1}{16}''''$; that Wilke agreed to furnish a minimum of 50 window frames by April 25, 1960, and a minimum of 50 window frames per day thereafter. To expedite delivery the parties agreed that the first 500 window frames should be made by the welding process in accordance with a shop drawing made by plaintiff on March 31, 1960. A note on the drawing contained the following statement: "$\frac{1}{4}''$ x $\frac{3}{4}''$ recessed holes are used to prevent interference with anchor screw heads." This was drawn for the production of the welded units.

The first 500 window frames delivered to David were examined by David's agents and found to conform to the specifications. The remainder of almost 4,000 window frames were made by the extrusion process in accordance with the "Window-Sketch" dated March 25, 1960, and revised March 26, 1960.

All of the window frames were delivered to David and were installed by David in the buildings known as the University Apartments. Fasteners for the installation were selected and purchased by David. The first windows were installed in September 1960; in March 1961, after approximately 90 percent had been installed, David notified Wilke that the glass stops in many of the windows were popping out. David then proceeded to remedy the situation by having the glass removed by Hamilton Glass Company in order that David's men could put holes in the glass stops so that the stops could pass over the interfering screw heads, then Hamilton's men put the glass back in and reputtied the windows. The guess of the witness Hammerquist was that this corrective work was done on 50 to 70 percent of the more than 4,000 window frames delivered by Wilke. The total cost to David was $12,989.88, which included wages to its own

men, payment to Hamilton Glass for glaziers' time, to Economy Window Cleaning Company for cleaning repaired windows, and to Ace Hardware for cleaning materials. Wilke refused to accept any responsibility for any portion of the cost of any corrective measure, stating in its letter of March 20, 1961, to David:

> "Your contract with Wilke Metal Products called for Windows only which we furnished per approved Shop Drawings. Fastening Screws were selected and installed by your personel [sic] and Glass and Glazing was furnished by others than Wilke Metal Products and, as a great number of stops are acceptable, we cannot understand why you request backcharges for necessary corrections from Wilke and not your Glazing Contractor who certainly should have notified you long prior to completion of glazing, of the Screw Head-Glazing Bead interference."

Wilke's first contention is that David's notice of the alleged breach of warranty came too late to hold the seller for damages for the alleged breach of warranty, since the buyer made no inspection, nor did he give notice until approximately six months after delivery of the window frames. Section 49 of the Uniform Sales Act (Ill Rev Stats 1961, c 121½, § 49), which was in effect at the time of this transaction, provides:

> "In the absence of express or implied agreement of the parties, acceptance of the goods by the buyer shall not discharge the seller from liability in damages or other legal remedy for breach of any promise or warranty in the contract to sell or the sale. But, if, after acceptance of the goods, the buyer fail to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor."

The defects which David alleges to exist in the extruded frames are that the holes were not recessed and were placed in such a position as to interfere with the stop. However, the evidence shows that the extruded frames were to be manufactured in accordance with the "Window-Sketch" dated March 25, revised March 26. In examining that drawing, this court cannot find any notation stating that the holes were to be recessed. Therefore, the only defect with which we are concerned is the allegation of the improper alignment of the holes.

In the brief filed in this court David states that the holes should have been "recessed and in the proper place. Neither defect, in and of itself, would have caused the interference and resulting popping, but the combination of the two brought about the unfortunate result."

The evidence indicates that David had made inspections of the window frames made by the welding process in April of 1960, when they were first submitted, and had made two other examinations of these frames in May and June of 1960, at the time of their installation. However, David did not inspect any of the window frames made by the extrusion process when they were first delivered, but inspected them after approximately 90 percent of the frames were installed, at which time the alleged defect was discovered. David then notified Wilke of the defective frames. Since notice was given within a reasonable time after the buyer knew of the breach, the question is whether it was given within a reasonable time after the buyer ought to have known of such breach. Assuming that the defect did exist, causing a breach, the question is whether it was a latent defect which a reasonable inspection would not have revealed. In Smith v. Morrow, 230 Ill App 382, 388, the court said:

> "In order to come fully within the scope of the definition of a latent defect, the defect must be hidden from the knowledge as well as from the sight and must be one which could not be discovered

270

by the exercise of ordinary and reasonable care
. . . . No defect is latent which can be discovered
by the exercise of reasonable care, or which a rea-
sonable inspection will reveal."

It is important to note how the alleged defect was
discovered. Mr. Schneider, vice-president of David Archi-
tectural Metals, had the glass removed from the window
frame, then had the window stops removed. This enabled
the inspectors to see that there was interference between
the screwhead anchorage and the glass stop. By such
removal the windows were placed in the same condition
they were in when delivered to David, without glass. The
defendant could have noticed the alleged defect by simply
looking at the frames when they were delivered. Did
David have a duty to inspect the window frames when
delivered? In House of Price, Inc. v. Kliegman Bros.,
Inc., 126 NYS2d 764, 768, the court said:

"In reality, therefore, the question is whether one
who buys by sample or description and receives into
his possession such goods as are tendered by the
seller without inspecting such goods before receiv-
ing them into his possession is under a duty to in-
spect such goods after receiving them into his posses-
sion, or whether such buyer is at liberty to sit back
and inspect only if, as and when, it suits his con-
venience.
"I think such buyer is under a duty to inspect
when he receives the goods into his possession.
"Pierson v. Crooks, 115 NY 539, 551, 22 NE 349,
352: 'It is the duty of a purchaser to act promptly in
making an examination of goods sent upon his order,
to see whether they comply therewith.' "

■ ■ In the case at bar David had a duty to in-
spect the window frames when delivered to see if they
were manufactured in accordance with their agreement.

271

An inspection at that time would have revealed the alleged defect, if in fact there was a defect. Notice given by David in this case was not timely because it was given six months after David ought to have known of the alleged breach.

David also claims that there was a custom and usage in the building trades relating to the lack of obligation of the defendant to inspect the goods. In the case before us David admits that it made no inspection of any of the 4,000 extruded windows before installation, and it was also admitted that David had installed 3,600 to 3,800 of the windows, and that the glazing subcontractor completed its work before any alleged defect was discovered. In support of this contention David offered two witnesses; one Cassie—whose testimony, in the opinion of this court, was properly stricken from the record by the trial court— and Herbert Lee, who stated, with reference to the customs in the building trades with respect to window lights, that under the custom and usage in the building trades in existence at that time and place, there was no obligation for a purchaser and erector of window frames to notify a seller and fabricator of the frames of deviations from the plans and specifications in that a window did not contain a recessed hole where a hole was called for, or where a hole was improperly placed. On cross-examination the witness testified that there was no custom and usage in the trade with reference to determining whether or not the openings for screws or nails were according to plans and specifications, or for the purpose of determining whether or not any of the openings for nails and screws were recessed. His testimony did not establish a custom and usage with reference to the matters at issue in the present case.

█ Wilke also contends that in order for custom and usage to be admissible, it must appear that it has been uniformly acquiesced in for such a period of time that it is presumed the parties had it in mind at the time of

making the contract, and that they entered into the contract intending that such custom or usage was a part thereof; and that it should be established by the testimony of several witnesses. As we have stated, David called two witnesses—Cassie and Lee—to testify to the custom and usage of building trades relating to the nature of the obligation of a contractor to inspect goods delivered pursuant to a contract for fabrication. In F. B. Miller Agency, Inc. v. Home Ins. Co., 276 Ill App 418, at 427 the court said:

> "A custom or usage to become binding upon the parties must have antiquity as well as uniformity and universality. Crawford v. Clark, 15 Ill 561. It must appear that it has been uniformly acquiesced in for such a period of time that it is presumed that the parties had it in mind at the time of making the contract and that they entered into the contract intending that such custom or usage was a part thereof. [Citing cases.] . . . A custom should be established by the testimony of several witnesses."

In Traff v. Fabro, 337 Ill App 83, 84 NE2d 874, at 88, the court said, citing Bissell v. Ryan, 23 Ill 566:

> " 'It will generally be desirable when a particular usage is relied on, to establish it by the testimony of several witnesses; and if it be a well-established usage, as it ought to be, this will not be difficult.' The rule announced in the Bissell case with respect to proof of a custom or usage has been consistently adhered to by the courts of our State. See Adam Groth & Co. v. Goss & Guise, 232 Ill App 450; F. B. Miller Agency, Inc. v. Home Ins. Co., 276 Ill App 418."

The custom relied on by David was not established.

■ ■ David contends that the question of time within which it ought to have known of the breach is one of

273

fact for the trial court, and that findings of fact by the trial court will not be disturbed unless they are clearly contrary to the manifest weight of the evidence. This court agrees with that statement of the law. However, a review of the evidence indicates that the trial court's finding that notice of breach of warranty by David to Wilke was timely, was against the manifest weight of the evidence.

In his brief in this court David cites Smith v. Morrow, 230 Ill App 382, which case is not applicable. He also cites Wainwright v. Elgin Windmill Co., 9 Ill App2d 574, 134 NE2d 44; and Mayflower Sales Co. v. Frazier, 325 Ill App 314, 60 NE2d 123. The Wainwright case, citing Mayflower, merely states that the question of what is a *reasonable time is ordinarily a question of fact for the jury.*

David did not prove at any place in the record the number of windows which allegedly had holes that were out of line. Even if the paid bills of Hamilton Glass were actually in evidence, considerable doubt is thrown on their accuracy by the fact that Alan R. Schneider, vice-president of David, testified that there had been an understanding with Hamilton Glass that David was only going to pay a proportionate share of the labor cost. Schneider also testified that he did not know how many windows were repaired in the occupied portion of the building, and there is nothing in the record which would indicate what apartments had windows which were repaired. There is no evidence as to how many of the holes were improperly drilled, if any.

Wilke's next contention is that the matters for which David claims damages could have resulted from negligence of David or the other contractor, or from weather conditions, rather than from the claimed breach of warranty. The testimony clearly indicates that there was more than one explanation for the loosening of the glass beads. Mr. Harold Heineg, witness for Wilke, had the

274

opinion that it could be the interference between the fastening device and the glazing head or stop member; that it could also have been caused by built-up mastic underneath, or because of improperly seated beads at the time of installation; and that it also could be caused by the lack of recess, contingent on the location of the screw in the area.

John Sika, a witness for David, testified with reference to the damage being caused by the holes not being recessed, and stated that where the stop member had popped out they found it was caused by the hole not being recessed and being drilled off-center toward the inside of the building. But he further testified that it was possible if the glazier did not tap the stop long enough to snap it in, it would not be in a snapped-in position.

Hammerquist, a witness for David, testified that he was employed by David as an ironworker, and that he did not know how many windows were fixed; that it was maybe 50, 60 or 70 percent. He also testified that the popping took place after the installation and was caused by the weather; that aluminum expands and contracts more than steel, and the only reason he could give would be the expansion and contraction and the cold and warm weather.

In Condon v. Schoenfeld, 214 Ill 226, 230, 73 NE 333, the court said:

> "It cannot be said that the existence of a certain fact may reasonably be inferred from the evidence when the existence of another fact inconsistent with the first can be, from the same evidence, inferred with equal certainty. The evidence must point to the existence of some particular fact rather than to the existence of another fact inconsistent with the first before it can be said that such evidence alone tends to prove the existence of the first."

In Celner v. Prather, 301 Ill App 224, 22 NE2d 397 at 227, the court said: "It cannot be said one fact can be inferred, when the existence of another inconsistent fact can be drawn with equal certainty." In the instant case, there is more than one possible explanation for the loosening of the glass beads. David therefore failed to meet its burden of proof in this regard.

At the close of all the evidence Wilke offered to file an amended reply to the defense and counterclaim to conform the pleadings to the proof, which motion was denied by the court. Considering the evidence as a whole, whether or not the court was in error in denying the filing of the amended reply is immaterial.

Wilke proved the allegations in the original complaint and the court properly made a finding in Wilke's favor for $8,404.80. David did not by a preponderance of evidence prove the allegations in the counterclaim, and the trial court improperly found that David had proved damages in the sum of $12,989.88. Judgment was therefore improperly entered against Wilke and in favor of David in the sum of $4,585.00.

The judgment of the trial court is reversed and the cause is remanded with directions to vacate the judgment entered in the trial court, to enter a judgment in favor of Wilke on its original complaint, in the sum of $8,404.80, and to enter judgment against David on its counterclaim.

Reversed and remanded with directions.

DRUCKER and ENGLISH, JJ., concur.