DONALD A. DENNISTON, Indiv. and as Adm'r of the Estate of Norma Denniston, Deceased, Plaintiff-Appellee, *v.* SKELLY OIL COMPANY *et al.*, Defendants-Appellants.

Third District   No. 76-139

Opinion filed April 13, 1977.—Rehearing denied May 24, 1977.

David R. McDonald, of Lucas, Brown & McDonald, of Galesburg, and Sam C. Oliver, of Tulsa, Oklahoma, for appellant Skelly Oil Company.

James Elson, of Claudon, Elson, Lloyd & Barnhart, Ltd., of Canton, for appellants Robert L. Williams and Arlene Williams.

Robert C. Stoerzbach, of Barash & Stoerzbach, of Galesburg, for appellee.

Mr. JUSTICE BARRY delivered the opinion of the court:

The action underlying this appeal was brought by Donald A. Denniston, individually and as the administrator of the estate of Norma Denniston, his deceased wife. The amended complaint alleged negligence on the part of the Skelly Oil Company, Robert L. Williams and his wife Arlene. The relief sought was money damages on behalf of the decedent's next of kin for her death, money damages for damage to the plaintiff's property and money damages on behalf of the decedent's estate for her pain and suffering and medical, hospital and burial expenses. Following the trial, the jury returned verdicts for the plaintiff on all three counts against all the defendants. The trial court entered judgment on these verdicts, and the defendants now appeal.

The plaintiff and his wife, the decedent, resided in Victoria, Illinois. They contracted with defendants Robert L. Williams and Arlene Williams to purchase a residence and acreage which was about four or five miles from Victoria, and about 15 miles east of Galesburg, Illinois. One daughter, Donna Watters, and one son, Gary, were married and had their own families and no longer lived at home. Their other son, Robert, who was approximately 19, and their other daughter, Betty Jo, 11, still lived with their parents. The real estate closing was held on the 5th or 6th of April in 1972, and the Dennistons were to obtain possession 30 days later, about the 6th of May.

Williams and his prior wife had purchased the premises in June of 1970. At that time, there was no facility for a gas stove or gas clothes dryer. Early in September of 1970, a gas dryer was installed in the basement of the premises. Williams and his wife divorced in 1971 and his ex-wife took the gas dryer and most of the tubing with her. Williams was remarried in December of 1971, and in early February of 1972, he arranged for a plumber to hook up both a gas stove in the kitchen on the first floor of the premises and a gas dryer in the basement. The dryer belonged to his present wife, Arlene. The plumber assembled the system by using a "T" connection in the basement, with one line going to the gas dryer in the basement and the other line running up through the floor of the kitchen to the gas stove.

The Dennistons were first shown the interior of the premises in early April of 1972 with a real estate sales representative. At that time the plaintiff viewed the entire premises, including the basement. Mr. and Mrs. Denniston on a later date went through the house a second time, and the

plaintiff then was again in the basement to examine it. On that day, Mr. Williams was with the plaintiff in the basement. The dryer was still connected there. Williams testified that he explained to the plaintiff that the plaintiff had a choice of either gas or electricity for the dryer in the basement and that he also had a choice in the kitchen of either gas or electricity for the stove. However, the plaintiff testified that Williams never told the plaintiff that there were facilities in the basement for a gas dryer. The plaintiff did notice a gas line entrance through the outside wall into the basement. He did not follow the line in to see where it went. While in the basement, the plaintiff looked at the basement walls. The plaintiff told Williams that the plaintiff had a gas dryer at his Victoria home.

On April 28, Robert Williams disconnected the dryer and left the end of the gas line in the basement unplugged. He also left the end of the gas line in the kitchen unplugged, where the stove was disconnected. He did not tell any member of the Denniston family that the line was unplugged. Williams still had a few things in the house and he had agreed to make certain roof repairs to the garage. Williams was on the premises on May 6, and the repairs were completed, and the only property he had left on the premises when he left that day were a couple of horses outside. On May 6, Williams removed a connector from the end of the gas line that was inside the basement, since he needed it to use on the dryer at his new residence. He also disconnected the regulator from the cylinders and gas line on the outside of the house. The regulator belonged to his ex-father-in-law. It is a device which is necessary in order to activate a bottled gas system and functions to reduce the pressure from the tanks to the pressure utilized in the line. Without it, the system is inoperable. He said he had the connector plus two wrenches in his hand while he had a conversation with the plaintiff outside in the yard concerning the plaintiff's need to obtain a new regulator for the propane gas. The decedent also was in the basement with Mr. Williams on at least one of the visits while the gas dryer and the washer were still connected in the basement. The dryer did not obscure observation of the gas line in the basement.

On May 7, the Denniston family had a fish fry in the yard of the premises. The plaintiff was in the house on that day, and showed his daughter, Donna Watters, his son, Gary, and several other members of the family throughout the house, including the basement area. There were no appliances in the basement at that time. Neither Gary Denniston nor Donna Watters observed the gas line in the basement. About midnight of the 7th, or early morning of the 8th, the plaintiff took a load of machinery to Dubuque, Iowa, on a trip that lasted overnight of the 8th and until the afternoon on May 9.

On May 8, the Skelly Galesburg office received a telephone call from

the decedent for delivery of propane gas to the premises. That same day, Russell Squires, the cylinder delivery man from Skelgas, arrived at the residence at approximately 1 o'clock in the afternoon. One of the cylinders was partially full. Squires installed that cylinder, plus a full cylinder that he had brought, to a regulator and connected them to the line that was sticking out of the back of the house. He did not turn on the gas. He knocked on both the front and back doors, but no one answered. He then made out a ticket for the full cylinder he had delivered and wrote a note to the customer on the end of the ticket, stating that no one was home, he could not check out the system, and the gas valves were off. On the reverse side of the customer's copy, he also wrote that if they would call him, he would come back and check the line for leaks and the proper pressure on the regulator. He opened the front storm door and placed the ticket between the door and the door frame and closed the door. He never received any call after that to come out and check the lines. He did not later call the Denniston residence. The ticket was a standard delivery ticket used by Skelgas for the delivery of gas. He did not see the ticket again and did not ever receive an indication from anybody in the Denniston family or anybody else that any of them actually received it. He said that the ticket was of a neutral color much like a manila folder. Squires testified that he did not have any idea whatsoever whether the Dennistons normally used the front door or the back door of their home. He did not give instructions to any personnel in his company's office to call the Dennistons and tell them what was on the ticket. He said he had no knowledge of any kind that anybody employed by or connected with Skelly Oil Company in any way ever made any phone call to the Dennistons about the message on the ticket. Squires testified that the charge for the delivery is written on that ticket and that when a customer receives from Skelly Oil Company a ticket such as that, he usually finds nothing on the back. Squires testified that, after he left the property of the Dennistons, he considered his job incomplete. Nevertheless, he also testified that he did not intend to do anything more unless he received a phone call from them. He said he was going about his business of other deliveries unless they called him. Mr. Squires testified that in an effort to check to see what the situation was in the basement about the gas line, he tried to see in the basement window near where the cylinders were situated. He saw nothing when he looked in the basement window as it was too dark. He said that, with his experience in the industry, one of the things he was trying to look for when he was looking in that basement window was to see if there were any open gas lines. He said Skelly employees do not attempt to enter a residence if no one is home. Squires testified that Skelly's standard procedure in checking a gas system for leaks is to use a manometer at the point of the installed appliance inside

the house, that normally a checking out of the gas piping system goes with a delivery of any gas if it is a new customer, and that it would be more important then. Squires had been with Skelly for approximately 20 years and has attended 20 to 25 safety and training schools during that time.

The decedent, Norma Denniston, was the first member of the family to go to the new dwelling on May 9. She had been there about 10 that morning and had returned to Victoria. The family started to move furniture into the new residence that afternoon. The plaintiff arrived at the new dwelling about 3 in the afternoon. He did not find the note from Skelly. The moving was completed that night. The plaintiff noticed that the end of the gas line in the kitchen was uncapped, and he then hooked up the gas stove to the copper tubing gas line that was sticking up through the floor in the kitchen. After having connected the stove to the uncapped line, he then went outside and turned on the gas at the cylinders. He then returned inside and checked his connection to the uncapped line with soap suds at the point of connection with the stove. He did not check the gas line further. He had planned to install the gas stove himself. He considered himself qualified to do it. He was tired and he then went to bed. It was then about 9:30 in the evening. Donna Watters had arrived early that evening and helped with the moving. She did not see the note from Skelgas. Gary Denniston helped with the moving and made his first trip to the new dwelling about 4 in the afternoon. He did not see the note from Skelgas.

When the plaintiff turned on the gas at the cylinders, the gas proceeded to flow through the gas line into the home and escaped through the uncapped line in the basement and accumulated there. The next morning, Mrs. Denniston went downstairs to fix breakfast and used the bathroom on the first floor of the residence. Just a second after the toilet was flushed, an explosion took place, apparently as a result of a spark from the electric water pump. Mrs. Denniston suffered burns from which other complications developed, resulting in her death on June 9, 1972.

The plaintiff, Donald Denniston, at the time of the trial was 55 years of age. He had a mechanical background, having been in the ordnance branch of the army, worked for an oil drilling company, and served as a mechanic, shop superintendent, and director of maintenance and equipment for two truck lines before going into business for himself. His business, Victoria Trucking Equipment in Victoria, Illinois, installed special engines and other items on tractors and trailers. He had worked with, and was familiar with, propane gas, freon, oxygen and acetylene. He had made at least three or four gas stove installations over the past years (and perhaps as many as 10 or 12 according to his deposition). He had done some plumbing work in the past and had flaring tools that could be used for automotive or plumbing purposes. He himself had built one

home and partially built another. He had used propane gas in bottles (cylinders) within the 10-year period prior to the date of the accident.

The plaintiff's complaint charges that Skelly was negligent in the installation of the cylinders, in not performing any pressure tests on the outside of the premises, in failing to warn the plaintiff and his family concerning dangers attendant to the turning on the gas, and in failure to train or instruct its employees in the proper method of installation and testing. Skelly's amended answer admits the duty to inspect the gas pipe system before Skelly turned on the gas for use, but affirmatively states that it connected the cylinders and the regulator to the existing system but did not turn on the gas (the cylinder valves remaining closed), since Skelly had no access to the dwelling to inspect the system.

James L. Hagrelius, the district manager of the Galesburg office of Thermogas Company, who had been in the propane gas business for over 25 years, was allowed to testify, as an expert witness for the plaintiff. He is a past president of the Illinois L.P. Gas Association, District III. For over 25 years his duties involved LP gas service in Knox County. They included the supervision of deliveries of gas in the rural areas of that county. He had taken training sessions in the home office of his company and was in charge of transmitting safety practices to the men under him in Knox County. He testified that by reason of his experience in the LP gas industry over the past 25 to 26 years he was familiar with the customs and practices in the delivery of LP gas in Knox County.

Over objections by Skelly, he testified as follows: If a propane gas delivery man is making a requested delivery to a new customer and finds no one home and finds a disconnected system, Hagrelius would assume that the delivery man would not make the delivery; to the best of his knowledge, that would be the general practice and custom in Knox County in May of 1972; and Hagrelius would say the general practice was to not hook up the cylinders. Hagrelius' company, Thermogas, does make a common practice of delivering cylinders to a customer in a rural area and the cylinders are left on the premises, unconnected, to be connected by the customer. Hagrelius did not have copies of, nor was he familiar with, the written rules and regulations of any propane company other than Thermogas. Hagrelius' company does not use a manometer for checking a system but uses a pressure test block. In Hagrelius' opinion, Skelly is a safe, good, operating company.

Marvin A. Salzenstein, a consulting engineer, was also called as an expert witness by the plaintiff. Mr. Salzenstein received a bachelor of science degree in mechanical engineering from the Illinois Institute of Technology in 1951. He was a member of the American Society of Mechanical Engineers, the American Society of Safety Engineers (continuously since about 1965), the National Safety Council (for

approximately 15 years), the National Fire Protection Association, the American Gas Association (continuously since about 1959), the American Society of Mechanical Engineers and the National Society of Professional Engineers. Since 1957 he has been a member of the National Fire Protection Association which publishes, on a yearly basis, standards and safety codes with respect to fire prevention and other matters. He testified that during his practice as a professional engineer he had studied and researched safety procedures including, among other things, LP gas and the practices throughout the country and that his experience over the past 15 or 20 years covered the entire country. He said that in addition to his studies he had investigated particular explosions and fires. During the course of his work in that field and in the safety field he had written published articles on gas explosions. He had done lecturing in the field of safety in gas explosions. He had worked with the Honeywell Company, manufacturer of furnace and water heater controls, on explosions dealing with LP gas, where that company's control was involved. He has studied, considered and researched safety procedures as they pertain to the delivery of LP gas to a customer. He testified that there is no known codified standard or regulation pertaining to the question of what a cylinder delivery man should do when he delivers cylinders to a new customer and finds no one home. Salzenstein was allowed to testify, over the objections of Skelly, that in his opinion, the procedure a gas delivery man should follow would be to leave a note and to take the cylinder back. He further testified that a manometer test for leaks could have been made on the outside of the premises by connecting the manometer to the line and using some water and a hand pump; or that a leak could have been discovered by turning on the gas and listening at the regulator for an audible, continuous hissing sound that would indicate a serious gas flow escaping into the house, which was demonstrated by the witness before the court and jury. He testified that the manometer is common and is used to check out every gas system. Salzenstein also was allowed to testify, over the objections of Skelly, that, if a notice is left at a dwelling having a gas tank installed, it is his opinion it should be left at the tank valve.

Skelly Oil introduced into evidence Pamphlet No. 54 published by the National Fire Protection Association, which pamphlet was duly adopted (and in effect during all of May 1972) as rules and regulations by the Illinois Department of Law Enforcement pursuant to statutory authority (which rules and regulations have the force of law). Section 2.10.11(a) requires that "when an appliance is disconnected from an outlet and the outlet is not to be used again immediately, it shall be securely closed gas tight." However, Salzenstein pointed out that in 1972 the pamphlet was used by gas utilities, L.P. gas distributors, persons in the gas business and fire officials.

Mr. Robert LeFebvre, the manager of Skelly's Galesburg office, has been in the propane gas business over 23 years, and has attended approximately two or three service and safety schools each year during that time. He testified that the normal procedure in testing a gas system for leaks with a manometer is at the point of the appliance inside a dwelling, where there is access to the valve that controls the burner on the appliance, and the gas is turned off and no further gas can enter. Nevertheless, checking from outside the house for uncapped lines is as effective as checking from the inside. LeFebvre testified that if a manometer test is made on the outside of a dwelling, the line should be disconnected from the regulator, a "T" joint inserted between the regulator and the line, the manometer connected to the third side of the "T", and gas must be turned on and run into the home. Using this procedure, if the person doing the testing turned on the gas and shut it off, the manometer reading (if any) would drop back to zero almost instantly, and that person would know that there was an open gas line. However, Skelly never makes it a practice to run gas into a house when nobody is home.

The defendants moved for directed verdicts at the close of the plaintiff's case and again at the close of all the evidence. All were denied by the trial court. Judgment was entered on the verdicts in favor of the plaintiff and against the defendants on all three claims. The jury returned a verdict for the plaintiff administrator and against all defendants for wrongful death in the amount of $62,000. The jury also found for the plaintiff administrator for pain and suffering, medical expenses and funeral expenses in the amount of $28,067.35 and for the plaintiff individually in the amount of $16,994.50. The defendants' post-trial motions for judgment notwithstanding the verdict or for a new trial were denied.

The defendants raise a number of issues in this appeal. The most significant of these is whether, as a matter of law, the plaintiff was guilty of negligence which was the proximate cause of the explosion or whether there was such an efficient intervening cause as to cut off the liability of the defendants.

■■ Ordinarily, the issues of contributory negligence and proximate cause are questions of fact for the jury. (*Baylie v. Swift & Co.* (1st Dist. 1975), 27 Ill. App. 3d 1031, 327 N.E.2d 438; *Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 117 N.E.2d 74.) However, contributory negligence becomes a question of law "when all reasonable minds would agree that, based upon the evidence and the reasonable inferences drawn therefrom in the light most favorable to the plaintiff, a judgment in the plaintiff's favor would not be permitted to stand." (*Bekins Van Lines, Inc. v. Chicago Transit Authority* (1st Dist. 1975), 33 Ill. App. 3d 996, 998, 339 N.E.2d 507, 508-

09.) Furthermore, any question of fact may be taken from the jury if, with all of the evidence viewed in its aspect most favorable to the opponent, it so overwhelming favors the party moving for a directed verdict or judgment notwithstanding the verdict that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

Contributory negligence is the failure on the part of a plaintiff to exercise that care which, under the circumstances presented by the evidence, a reasonably prudent person would take to avoid injury. (*McInturff v. Chicago Title & Trust Co.* (1st Dist. 1968), 102 Ill. App. 2d 39, 243 N.E.2d 657.) As the term indicates, to be contributory negligence, the plaintiff's negligence must have combined with the negligence of another person to cause the injury. (*McInturff v. Chicago Title & Trust Co.* (1st Dist. 1968), 102 Ill. App. 2d 39, 243 N.E.2d 657.) Unless a plaintiff is free from contributory negligence, that plaintiff can not recover in an action based on negligence. *Maki v. Frelk* (1968), 40 Ill. 2d 193, 239 N.E.2d 445.

In the case at bar, the defendants moved for directed verdicts and judgments notwithstanding the verdict. Therefore, the *Pedrick* standard should have been applied to the issue of contributory negligence. The facts of this case clearly show that the plaintiff connected the stove and turned on the gas without determining whether there were any other gas outlets in the house which may or may not have been properly capped. And the plaintiff admits having experience in dealing with such dangerous and explosive gases. As this court has determined that the danger of electrical energy is a matter of common knowledge (*Stambaugh v. Central Illinois Light Co.* (3d Dist. 1976), 42 Ill. App. 3d 582, 356 N.E.2d 148), so must we conclude that the dangers inherent in propane gas are matters of common knowledge.

■■ The exercise of ordinary care on the part of the plaintiff would have avoided any property damage to the plaintiff's property. Therefore, he can not now be allowed to recover for his property damages resulting from the explosion. After viewing all of the evidence in the light most favorable to the plaintiff, we believe no verdict in favor of the plaintiff could ever stand. For this reason, the judgment awarding the plaintiff $16,994.50 for property damage will be reversed. This is the only judgment affected by the plaintiff's contributory negligence because it is the only count of the complaint brought by the plaintiff, individually.

■■ Nevertheless, the other judgments will be affected by a determination of whether there was such an efficient intervening cause as to relieve the defendants of liability for their negligence. The law governing this issue was set out in *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 316-18, 45 N.E.2d 665, 675:

"[I]f the negligence charged does nothing more than furnish a condition by which the injury is made possible and that condition causes an injury by subsequent, independent act of a third person, the creation of the condition is not the proximate cause of the injury where the subsequent act is an intervening efficient cause which breaks the causal connection between the original wrong and the injury, and itself becomes the proximate or immediate cause. The cause of an injury is that which actually produces it, while the occasion is that which provides an opportunity for the causal agencies to act. (*Briske v. Village of Burnham*, 379 Ill. 193.) The test that should be applied in all cases in determining the question of proximate cause is whether the first wrongdoer might have reasonably anticipated the intervening cause as a natural and probable result of the first, party's own negligence. (*Seith v. Commonwealth Electric Co.*, 241 Ill. 252.) If the act of a third party is the immediate cause of the injury and is such as in the exercise of reasonable diligence would not be anticipated and the third person is not under the control of the one guilty of the original wrong, the connection is broken and the first act or omission is not the proximate cause of the injury. There may be more than one proximate cause of an injury. But if two wholly independent acts, by independent parties, neither bearing to the other any relation or control, cause an injury by one creating the occasion or condition upon which the other operates, the act or omission which places the dangerous agency in operation is the efficient intervening cause that breaks the causal connection and makes the other act or omission the remote and not the proximate cause of the injury.
\* \* \*

What constitutes the proximate cause of an injury in a particular case is ordinarily a question of fact to be determined from all the attending circumstances, and it can only be a question of law when the facts are not only undisputed but are also such that there can be no difference in the judgment of reasonable men as to the inferences to be drawn from them. (*Phillabaum v. Lake Erie & Western Railroad Co.*, 315 Ill. 131." Accord, *Ray v. Cock Robin, Inc.* (1974), 57 Ill. 2d 19, 310 N.E.2d 9; *Ney v. Yellow Cab Co.* (1954), 2 Ill. 2d 74, 117 N.E.2d 74.

■■ As the facts of this case show, defendant Robert Williams removed the plugs from the ends of the lines and removed the regulator. Although this may have been negligence on the part of Williams, the evidence shows that the system could not function without the regulator. Reasonable persons could not differ in the conclusion that the explosion would not have occurred had the Skelly employee not installed a

different regulator. We also believe that reasonable persons must find that Williams could not reasonably foresee Squires failure to test the gas lines. Therefore, the trial court should have granted either the Williams' motions for a directed verdict or their motion for a judgment notwithstanding the verdict. This error compels a reversal of all judgments against both Williams. Because we reach this result, we need not consider the other issues raised in the Williams' briefs.

■■ Skelly contends that Denniston's acts were such an efficient intervening cause as to foreclose Skelly's liability. We disagree. The jury could find from the evidence that, once Squires connected the regulator so as to put the system into working order and left the gas tanks, it could reasonably be foreseen that someone could negligently turn on the gas. Because there is a possibility of a difference in the judgment of reasonable persons on this issue, we refuse to take this question from the jury. Thus we cannot consider Denniston's acts as such an efficient intervening cause as to cut off Skelly's liability for negligence.

■■■ Skelly also contends that it did not owe any duty to the Dennistons. As a general rule, where a gas company does not install the pipes or fixtures, does not own them and has no control over them, it is not responsible for their condition or for their maintenance and, as a result, is not liable for injuries caused by a leak therein of which the gas company has no knowledge. (*Clare v. Bond County Gas Co.* (1934), 356 Ill. 241, 190 N.E. 278.) From the cases cited by the appellant, it appears this rule of law was developed to resolve cases dealing with ongoing service, not a case involving a first-time delivery of gas to a new customer to whose building the gas system has previously been disconnected. Therefore, a different standard of case must be applied in this appeal. Generally, in negligence cases, the duty is " ' * * * to conform to the legal standard of reasonable conduct in the light of the apparent risk. * * *' " (*Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 331, 211 N.E.2d 253, 257 (quoting Prosser on Torts 331 (3d ed. 1964)).) "Every person owes to all others a duty to exercise ordinary care to guard against injury which may naturally flow as a reasonably probable and foreseeable consequence of his act * * *." (*Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 622, 126 N.E.2d 836, 840.) However, the dangerous nature of the commodity involved in this case requires that a gas supplier has a duty to use every reasonable precaution to avoid injury to the persons and property of others. *Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 207 N.E.2d 305.

■■ Conformity to custom and usage may be considered in determining whether due care has been exercised in a given case. (*Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253; 28 Ill. L. & Prac. *Negligence* § 26 (1957).) "[A]

deviation from customary practice is sufficient to furnish an evidentiary basis for a finding of negligence by a jury whenever there is some evidence in the record from which a jury could infer that the deviation may have resulted in an unreasonable risk of harm to the plaintiff." *Mick v. Kroger Co.* (5th Dist. 1966), 73 Ill. App. 2d 155, 161, 218 N.E.2d 654, 657.

The plaintiffs called James L. Hagrelius to testify to the general practice for gas delivery in Knox County. The testimony of one witness is generally insufficient to establish the existence of a custom. (*Marler v. Moultrie-Shelby Farm Service* (4th Dist. 1973), 11 Ill. App. 3d 204, 295 N.E.2d 744.) The defendants also suggest that even two witnesses may be insufficient, citing *Wilke Metal Products, Inc. v. David Architectural Metals, Inc.* (1st Dist. 1968), 92 Ill. App. 2d 265, 236 N.E.2d 303. In the *Wilke Metal Products* case, however, two witnesses were offered to prove a custom, but one's testimony was properly stricken by the trial court.

■■ Hagrelius testified that, if a delivery man making a requested delivery to a new customer finds no one at home and finds a disconnected system, the delivery man would not deliver the gas. Squires, Skelly's delivery man, testified that normally, when delivering gas to a new customer, the gas system is checked out. Furthermore, Salzenstein testified that in his expert opinion, when a delivery to a new customer is attempted but no one is found at home, the delivery man should leave a note and take the cylinder back. If, however, a tank is left, a warning note should be left at the tank valve according to Salzenstein.

■■ We believe that this evidence is sufficient to establish the existence of a custom. In any event, the existence, or lack of, a custom, is not conclusive of whether there has been an exercise of due care or whether the conduct complained of is negligence. (65 C.J.S. *Negligence* § 16 (1966); 28 Ill. L. & Prac. *Negligence* § 26 (1957).) That conduct does or does not conform to a custom is merely a circumstance to be considered with other circumstances in determining whether due care has been exercised. (65 C.J.S. *Negligence* § 16 (1966).) Therefore, the failure to show a custom upon which to predicate negligence is not sufficient to destroy a jury's finding of negligence if the jury may determine that the acts complained of constitute negligence from other evidence and common knowledge. *Texas Co. v. Brown* (Tex. Civ. App. 1935), 82 S.W.2d 1101.

■■ As a general rule, questions of due care, including whether or not the defendant created an unreasonable risk, are for the jury to determine, and once such a determination is made, the verdict can be set aside only if it is against the manifest weight of the evidence or reasonable minds could not differ as to the presence of due care under the circumstances.

The fact that a different trier of fact could have reached a different conclusion is an insufficient basis for overturning the verdict. *Mick v. Kroger Co.* (5th Dist. 1966), 73 Ill. App. 2d 155, 218 N.E.2d 654.

■■ ■ From the facts presented in this appeal, we believe that reasonable minds could differ as to whether Skelly created an unreasonable risk in breach of its duty to act with the care commensurate to the potential danger of injury from their commodity. We also believe that the jury's finding of duty and breach of duty is not against the manifest weight of the evidence. For these reasons, this court will not upset the jury's determination.

Skelly contends that it was improper, and therefore reversible error, for the trial court to allow Salzenstein to testify regarding his opinion which, Skelly claims, concerned ultimate facts, and thereby invaded the province of the jury, was speculative and was insufficient to establish any inference of departure from an established standard of safety practice. Since the trier of fact is not required to accept the expert's opinion, this evidence does not invade the province of the jury. (See *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.* (1971), 49 Ill. 2d 118, 273 N.E.2d 809.) Just as matters of fire prevention are generally beyond the knowledge or understanding of the average person (*In re Roberts Park Fire Protection District* (1st Dist. 1974), 20 Ill. App. 3d 282, 314 N.E.2d 208), so is the prevention of fire and explosion resulting from gases beyond the ken of the average person.

■■ The defendant argues that parts of the witness' testimony was speculative because it was an opinion of what could have been done. It is also argued that the testimony was insufficient to raise any inference of negligence to submit to the jury. That Salzenstein testified that a manometer test *could have been* performed from the outside of the building does not render this testimony incompetent. First, the ease with which a procedure could have been carried out to prevent the explosion can be considered by the jury to determine whether the defendant failed to exercise due care. Secondly, the defendant rebutted this testimony by presenting evidence of why they do not use a manometer test from the outside of a building when no occupant of the building is present. The admission of expert testimony is left to the discretion of the judge. (*Phillips v. Shell Oil Co.* (1973), 13 Ill. App. 3d 512, 300 N.E.2d 771.) We can not say that the trial judge abused his discretion by allowing the testimony of Salzenstein to be admitted into evidence.

■■ Based on all the previous arguments, Skelly contends that the trial court erred by not granting Skelly's motions for directed verdict or its motion for a judgment notwithstanding the verdict. The test for determining whether these motions should be granted is, considering all

the evidence in its aspect most favorable to the movant's opponent, does the evidence so overwhelmingly favor the moving party that no contrary verdict could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.504.) Skelly argues that the trial court looked only at the evidence most favorable to the plaintiff and not at all the evidence in its aspect most favorable to the plaintiff. Nevertheless, after reviewing the record, this court finds that the evidence does not so overwhelmingly favor Skelly that no verdict contrary to Skelly's position could ever stand. Therefore, even though the trial court may have applied an improper standard, the trial court's decision was correct and any such error was harmless.

■■ ■ Lastly, Skelly raises issues concerning the instructions given to the jury. However, none of the instructions, given or refused, are included in the record or abstract of record. In his brief, the plaintiff did not argue the merits of whether the giving of plaintiff's instruction and refusal to give Skelly's instruction was proper. Instead the plaintiff correctly pointed out the law to be that, before an issue on instructions will be considered by a reviewing court, all instructions and the identity of the party tendering each instruction must be presented to the reviewing court so that the instruction may be considered as a whole. (*People v. Woodruff* (1956), 9 Ill. 2d 429, 137 N.E.2d 809; *Department of Conservation v. First National Bank* (2d Dist. 1976), 36 Ill. App. 3d 495, 344 N.E.2d 11.) Skelly has moved that this court allow an amendment of the record to include the omitted instructions pursuant to Supreme Court Rules 329 and 366 (Ill. Rev. Stat. 1975, ch. 110A, pars. 329, 366). However, this motion to amend the record was filed after the plaintiff's brief was already filed and the plaintiff properly did not argue the merits of the instructions but urged the defendant's procedural failure. Because to allow the amendment would be unfair to the plaintiff, we deny the motion to amend the record. (See *Enlow v. Illinois Central R.R. Co.* (2d Dist. 1968), 103 Ill. App. 2d 269, 243 N.E.2d 847.) Since not all of the instructions are before the court, we refuse to consider the issues Skelly raises concerning the jury instructions.

Accordingly, the judgments of the Circuit Court of Knox County against Robert and Arlene Williams are reversed and the judgment against the Skelly Oil Company in favor of Donald A. Denniston, as an individual, for property damage is reversed. The remaining judgments against the Skelly Oil Company are affirmed.

Affirmed in part, reversed in part.

ALLOY, P. J., and STOUDER, J., concur.